**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:

NEXGENESIS HOLDINGS LTDA.,
GENCOMM FINANCIAL SERVICES        Chapter 15
DO BRASIL LTDA., GENCOMM INTERNET     Case No.: 22-14043-LMI
SERVICES DO BRASIL LTDA.,
GENCOMM LOGISTICS SERVICES DO
BRASIL LTDA.,

         Debtors in foreign proceeding.
_____/

**OBJECTION OF TOG BRAZIL HOLDINGS, INC. AND MIKE HAHN**
**TO MOTION FOR ORDER RECOGNIZING THE PRELIMINARY**
**ASSET FREEZE ENTERED BY THE BRAZILIAN BANKRUPTCY COURT**

      TOG Brazil Holdings, Inc. ("**TOG Brazil**") and Mike Hahn ("**Mr. Hahn**," and together

with TOG Brazil, the "**TOG Parties**"), pursuant to 11 U.S.C. §§ 105, 1506, 1507, and 1521(a)(1)

and 362(d)(1), file this objection (the "**Objection**") to the *Motion for Order Recognizing the*

*Preliminary Asset Freeze Entered by the Brazilian Bankruptcy Court* [ECF No. 15] (the "**Motion**")

filed by Expertisemais Serviços Contábeis e Administrativos Ltda. (the "**Foreign**

**Representative**").  In support of the Objection, the TOG Parties state as follows:

**SUMMARY OF ARGUMENT**

      The Foreign Representative asks this Court to recognize a stale (two-year-old) *ex parte*

prejudgment asset freeze order entered in Brazil which purports to freeze the assets of several

Respondents, including Mr. Hahn, a United States citizen.  Remarkably, the Foreign

Representative made no specific allegations of wrongdoing or misconduct of any kind by Mr.

Hahn in the underlying *95-page* Initial Pleading.  In fact, Mr. Hahn's name appears just once in

the lengthy document where he is identified as a defendant.  Similarly, in the Injunction Order, the

1

Brazilian Bankruptcy Court did not conclude that Mr. Hahn explicitly committed wrongdoing, took assets of the Debtors, or moved assets out of Brazil to the United States. Simply stated, the Foreign Representative's repeated assertions that the Injunction Order is entitled to comity and is relief that is available to a bankruptcy trustee in the United States is wrong. Without alter ego or similar evidentiary findings advanced to substantiate the requested prejudgment asset freeze (of presumably unlimited duration) against Mr. Hahn, this Court has no basis to grant the Motion.

Moreover, the Foreign Representative provided no justification for waiting a year and a half to file the Motion. This delay directly belies the urgency and necessity alleged by the Foreign Representative when it originally sought the Injunction Order in Brazil. It is apparent that the purpose of seeking recognition now, rather than when the Injunction Order was entered, has less to do with protecting the Foreign Representative's ability to recover assets in the Brazilian Proceeding and more to do with exerting leverage for a potential resolution using the hollow Injunction Order as to Mr. Hahn.

For these reasons and the others set forth herein, the Court should deny the Motion.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Motion and this Objection under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(P).

2.      Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## RELEVANT BACKGROUND

**A.      The TOG Parties' Business and Purchase of the Debtors.**

3.      Mr. Hahn is the co-founder of Ten Oaks Group ("**TOG**"), an investment office.

2

4.    TOG Brazil is a Delaware corporation and affiliate of TOG which was incorporated on October 8, 2019.  Mr. Hahn is a shareholder of TOG Brazil and is an officer and director thereof.

5.    TOG specializes in carve-out transactions pursuant to which TOG, or its affiliates, like TOG Brazil, acquires non-core lines of business from corporate sellers, like Rakuten Group, Inc., in order to implement a turnaround strategy and make such acquired non-core business successful.

6.    Rakuten began operations in Brazil in 2011 with two companies, then named Rakuten Brazil Holdings Ltda. (now Debtor Nexgenesis Holdings Ltda.) and Rakuten Brasil Internet Service Ltda. (now Debtor Gencomm Internet Services do Brasil Ltda.).

7.    Rakuten later expanded its operations to include Rakuten Brasil Financial Services Ltda. (now Debtor Gencomm Financial Services do Brasil Ltda.), Rakuten Brasil Logistics Ltda. (now Debtor Gencomm Logistics Services do Brasil Ltda.), and Rakuten Marketing Brazil Ltda.

8.    On October 14, 2019, Rakuten Brazil Holdings Ltda. and TOG Brazil entered into a Quota Purchase Agreement under which TOG Brazil purchased all quotas (shares) of Rakuten Brasil Internet Service Ltda., Rakuten Brasil Financial Services Ltda., and Rakuten Brasil Logistics Ltda. (collectively, the "**Acquired Companies**") from Rakuten Brazil Holdings Ltda. ("**Rakuten Holdings**").  Mr. Hahn is not a party to the Quota Purchase Agreement.

9.    The scope of the acquisition did not include Rakuten Marketing Brazil Ltda., which Rakuten viewed as profitable. The transaction was initially structured such that TOG Brazil would purchase the quotas (shares) of the Acquired Companies from Rakuten Holdings, and Rakuten Holdings would continue to own Rakuten Marketing Brazil Ltda.

10.    Between signing of the Quota Purchase Agreement and closing of the transaction, Rakuten opted to change the structure of the transaction such that TOG Brazil would purchase the

3

quotas (shares) of Rakuten Holdings. Because the proposed scope of the acquisition did not include Rakuten Marketing Brazil Ltda., this change in structure required that Rakuten Holdings transfer ownership of Rakuten Marketing Brazil Ltda. to Rakuten USA, Inc. in connection with the closing of the transaction. Contrary to the Foreign Representative's assertions in the Motion, TOG Brazil never intended to purchase Rakuten Marketing Brazil Ltda. and never took control of the entity.

11.    Based on the Quota Purchase Agreement, following the closing, TOG Brazil changed the names of the Rakuten-affiliated entities to the names the Debtors currently have – Nexgenesis Holdings Ltda., Gencomm Internet Services do Brasil Ltda., Gencomm Financial Services do Brasil Ltda., and Gencomm Logistics Services do Brasil Ltda.

12.    When TOG Brazil purchased the Debtors, it was aware that the Debtors were struggling financially, which is why the sale was consummated for a *de minimis* value. TOG Brazil purchased the Debtors using its strategy of purchasing non-core lines of business with every intention to turnaround the Debtors' operations in the pursuit of a successful business in Brazil. TOG and TOG Brazil had never done business in Brazil prior to the transaction with Rakuten.

13.    Following the sale, TOG Brazil made significant efforts to enact a turnaround and was making progress until Banco Itaú unilaterally made a change to their advance ratio for funding and cut off future receivables funding to the Debtors. This lack of funding forced Debtors to file for a joint judicial reorganization. To TOG Brazil's surprise, during the judicial reorganization proceedings, the Brazilian Bankruptcy Court determined that the Debtors—while under Rakuten's ownership—pledged certain receivables to Banco Itaú that were not property of the Debtors.

**B.    The Brazilian Proceeding, the Veil Piercing Action, the Injunction Order and the Appeals Therefrom.**

14.    Following TOG Brazil's attempts to turnaround the Debtors' operations, on February 3, 2020, the Debtors filed a request for joint judicial reorganization before the 1st Special

4

Lower Court for Judicial Reorganization and Bankruptcy in the Judicial District of São Paulo, Brazil (the "**Brazilian Bankruptcy Court**") which was granted on February 7, 2020.

15.      On April 5, 2020, the Debtors filed a petition to convert the judicial reorganization to a liquidation proceeding (the "**Brazilian Proceeding**") and, on April 13, 2020, the Brazilian Bankruptcy Court granted the Debtors' petition.

16.      According to the Declaration of the Foreign Representative in Support of the Chapter 15 Petition, Mr. Hahn "never assiduously participated in the management of [the Debtors]." *See* ECF No. 2, Ex. 1 at ¶ 29.

17.      On June 22, 2021, the Foreign Representative filed an adversary proceeding against Rakuten Marketing Brazil Ltda. and Rakuten Inc. seeking a declaration that the transfer of Rakuten Marketing Brazil Ltda.'s shares to Rakuten Inc. was ineffective and requested injunctive relief to attach those shares.  On June 23, 2021, the Brazilian Bankruptcy Court granted that injunctive relief.

18.      The Foreign Representative also filed a motion in the Brazilian Proceeding with respect to the loan taken out by Debtor Rakuten Financial Services two months prior to the sale to TOG Brazil.  As collateral, Rakuten Financial Services pledged certain receivables to Banco Itaú Unibanco.  The Brazilian Bankruptcy Court reviewed the transaction and prepetition pledge of collateral and ruled for the Debtors.  On appeal, the São Paulo Appellate Court determined that the pledged receivables did not belong to the Debtors.  *See* Motion ¶ 20; Declaration ¶ 17.

19.      As noted by the Foreign Representative, the ruling on the pre-sale transaction (before the TOG Parties' involvement) was relied on by the Brazilian Bankruptcy Court in its reasoning to enter the Injunction Order (as defined herein).  *See* Motion ¶ 21; Declaration ¶ 18.

20.     On December 15, 2021, the Foreign Representative filed an adversary proceeding (the "**Veil Piercing Action**") in the Brazilian Bankruptcy Court seeking to pierce the corporate veil and for damages against fifteen respondents: (1) Rakuten Group Inc., (2) Masayuki Hosaka, (3) Makoto Watanabe, (4) Rakuten USA Inc., (5) Reginald Rasch, (6) Luiz Carlos Giannini Tanisho, (7) Renê Toshiro Abe, (8) TOG Brazil, (9) Mr. Hahn, (10) Elaine Zucchi, (11) Denis Smetana Lopes, (12) Fernanda Agresta Santos, (13) Luiz Celso Meissner Baptista, (14) Rodrigo Panachi, and (15) Luis Henrique Pelizon Loureiro (jointly, the "**Respondents**").

21.     On December 15, 2021, the Foreign Representative filed an *ex parte* 95-page initial pleading (the "**Initial Pleading**") in the Veil Piercing Action alleging mismanagement of the Debtors in the time before the sale to TOG Brazil, the pre-sale pledge of collateral to Banco Itaú Unibanco, among other activities, and seeking relief therein.  *See* Motion ¶ 23.

22.     While the Foreign Representative included a copy of the Injunction Order and a translation thereof with its filed Motion, the Foreign Representative did *not* attach a copy of the Initial Pleading or a translation.  This document is critical for the Court's analysis of whether comity to the Injunction Order is proper.[1]

23.     Mr. Hahn is never mentioned, much less discussed, in the Initial Pleading and the Foreign Representative does not allege that Mr. Hahn himself committed a bad act or secreted funds from the Debtors.[2]  The allegations of wrongdoing in the Initial Pleading are made against

---

[1] Indeed, the Foreign Representative claims that the Initial Pleading sets forth "detailed facts about mismanagement," "self-dealing," and "fail[ure] to exercise reasonable diligence in perform[ance]" of management's duties.  *See* Motion ¶ 23.  The fact that the Initial Pleading does not mention or discuss Mr. Hahn *once* in 95 pages should strongly impact Court's determination of whether an asset freeze order based on no specific allegations is worthy of comity.  Because it is unquestionably the Foreign Representative's burden to prove the Injunction Order should be granted comity, the Foreign Representative should incur the cost of providing the Court with a translation of the Initial Pleading which purportedly provides the factual basis to freeze the TOG Parties' assets.

[2] Mr. Hahn's name appears one time in the Initial Pleading where he is identified as a defendant.  Otherwise, there is no mention of, or discussion of, Mr. Hahn in Initial Pleading.

the Respondents collectively.   Nevertheless, the Foreign Representative sought an order to freeze

assets of all Respondents, including Mr. Hahn, notwithstanding the lack of any specific allegations

which would distinguish one Respondent's purported actions against another's.

24.     On March 31, 2022, the Brazilian Bankruptcy Court granted an *ex parte*

prejudgment asset freeze order (the "**Injunction Order**").  In the Injunction Order, the court found

that—prior to the sale to TOG Brazil—among other things, that (i) the Debtors pledged funds that

did not belong to the Debtors; (ii) the actions of the Debtors' managers "indicate[d] the appearance

of a violation of several duties of the managers," such as the duties of diligence and loyalty; and

(iii) certain individuals benefited from substantial amounts, such as bonuses, when the financial

situation of the Debtors was perilous.  *See* Motion, ECF 15-1, p. 3; Declaration ¶ 25.  There are *no*

*findings* in the Injunction Order that Mr. Hahn individually committed bad acts or took assets of

the Debtors.

25.     Moreover, although the Foreign Representative made *no allegations* in its pleading

with respect to bad acts of Mr. Hahn and the Brazilian Bankruptcy Court likewise made *no findings*

of bad acts with respect to Mr. Hahn, the Injunction Order directed, *on an ex parte basis*, among

other things, the "[p]reliminary attachment . . . of all bank accounts of the [Respondents, including

Mr. Hahn], up to the limit of the obligation (R$141,143,139.86)" (approximately USD

$28,736,743.28) and "[a]ttachment of the [Respondents'] assets . . . ."  *See* Motion, ECF 15-1, p.

4; Declaration ¶ 26.

26.     The Injunction Order made no findings that there was a likelihood that, absent an

asset freeze, that any particular Respondent would secrete assets or otherwise take actions

detrimental to creditors of the Debtors.

27.     There were some appeals of the Injunction Order, including by Rakuten Group, Inc. and Rakuten USA, Inc.  Mr. Hahn, who has no assets in Brazil and did not take any assets from the Debtors, did not participate in appeals from the *ex parte* order because Brazilian counsel advised him that it was unlikely that the Injunction Order would be cancelled through an appeal. Mr. Hahn has since filed a defense to the Veil Piercing Action.

28.     The São Paulo Appellate Court denied all appeals.  In one decision, the appellate court stated that the asset freeze "does not deprive the owner of domain over the assets," and the purpose of the asset freeze is to prevent the Respondents from "engag[ing] in voluntary acts of disposal, emptying its assets to the detriment of any creditors . . . ."  *See* Motion ¶ 36.

**C.     The Chapter 15 Proceeding, the Foreign Representative's Failure to Provide Service, and Motion to Recognize the Injunction Order.**

29.     On May 23, 2022, the Foreign Representative filed the Chapter 15 Petition for Recognition of a Foreign Proceeding [ECF No. 1] and filed its *Verified Motion for Order of Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 and Request for Hearing* (the "**Motion for Recognition**") [ECF No. 2].

30.     Although the Injunction Order was entered nearly two months before the Foreign Representative filed the Motion for Recognition, the Foreign Representative did not mention the Injunction Order in the Motion for Recognition nor did it seek to have the Injunction Order recognized at the time.

31.     On May 24, 2022, the Court set the Motion for Recognition for hearing on June 16, 2022 [ECF No. 4].  On May 25, 2022, the Foreign Representative filed a Certificate of Service for the notice of hearing on the Motion for Recognition indicating that the only parties served were the Office of the United States Trustee, the Foreign Representative, and the Foreign Representative's U.S. counsel.  [ECF No. 5].

8

12864351-7

32.     On June 2, 2022, the hearing on the Motion for Recognition was re-noticed for June 16, 2022 [ECF No. 6].  On June 2, 2022, the Foreign Representative filed a Certificate of Service for the re-notice of hearing on the Motion for Recognition again indicating that the only parties served were the Office of the United States Trustee, the Foreign Representative, and the Foreign Representative's U.S. counsel.  [ECF No. 7].

33.     On June 6, 2022, the hearing on the Motion for Recognition was re-noticed a second time for June 16, 2022 [ECF No. 8].  On June 9, 2022, the Foreign Representative filed a Certificate of Service for the second re-notice of hearing on the Motion for Recognition again indicating that the only parties served were the Office of the United States Trustee, the Foreign Representative, and the Foreign Representative's U.S. counsel.  [ECF No. 9].

34.     On June 16, 2022, the Court entered its Order granting the Motion for Recognition (the "**Recognition Order**") [ECF No. 10].

35.     On June 21, 2022, the Foreign Representative filed its Certificate of Service of the Recognition Order and again served only the Office of the United States Trustee, the Foreign Representative, and the Foreign Representative's U.S. counsel.

36.     Notwithstanding the entry of the Injunction Order by the Brazilian Bankruptcy Court on March 31, 2022, the Foreign Representative waited until October 19, 2023 (or 567 days later) to file the instant Motion.

37.     When the Foreign Representative filed the Motion it utilized the below service list (notably absent are TOG Brazil and Mr. Hahn):

12864351-7

SERVICE LIST

|  | Counsel Name(s) | Counsel Email Address |
|---|---|---|
| Rodrigo Panachi | Gustavo Bassoli Ganarani | gustavoganarani@yahoo.com.br |
| Fernanda Agresta Santos | Dr. Laio Gastadello Zambelo | contato@bga-adv.com |
| Luiz Celso Meissner Baptista | Marcelo Medina de Oliveira Campos | marcelomedinaoc@outlook.com |
| Denis Smetana Lopes | Arthur Zeger | arthur@zeger.com.br |
| Luiz Carlos Gianinni Tanisho | João Guilherme Monteiro Petroni, Matheus Henrique Sucupira Traballe | joao.petroni@cgmlaw.com.br matheus.traballe@cgmlaw.com.br |
| René Toshiro Abe | Fabio Polli Rodrigues, Natália Mont Serrat Bueno Esteche, Jamile Andrade Araujo | fabio@pollirodrigues.com natalia.montserrat@pollirodrigues.com jamile.andrade@pollirodrigues.com |
| Rakuten USA | Gary F. Eisenberg | geisenberg@perkinscoie.com |
| Rakuten Group | Sergio Nascimento | spintimacoes@bermudes.com.br |
| Reginald Rasch | Gary F. Eisenberg | geisenberg@perkinscoie.com |
| Elaine Zucchi | Aline Hungaro Cunha, Eduardo Boccuzzi | aline@boccuzzi.com.br eduardo@boccuzzi.com.br |
| Luis Henrique Pelizon | Ivo Bari Ferreira, Renato Vilela, Lygia Dias Ferreira | administracao@bvzadvogados.com.br |

38.     The Foreign Representative did not serve any of the previous filings in this case on the TOG Parties until after counsel for the TOG Parties reached out to counsel for the Foreign Representative to inquire about the matter.

**D.     The TOG Parties' Cooperation with the Foreign Representative.**

39.     On December 20, 2023, the TOG Parties and the Foreign Representative entered into a confidentiality agreement (the "**Confidentiality Agreement**") pursuant to which the TOG Parties would share documents with the Foreign Representative on a confidential basis.

40.     On December 22, 2023, the Court entered its *Ex Parte Agreed Order Approving Confidentiality Agreement* [ECF No. 25].

41.     The TOG Parties have cooperated with the Foreign Representative and have provided documents and answered questions relating to the sale and information otherwise relevant to the Veil Piercing Action.

## ARGUMENT & MEMORANDUM OF LAW

**A.     THE TOG PARTIES RECEIVED INSUFFICIENT SERVICE OF PROCESS.**

42.     These Chapter 15 proceedings have been flawed from the beginning—with the Foreign Representative's failure to provide sufficient service of process to known interested parties, including the TOG Parties, *for over a year and a half*.  The Foreign Representative knew that it may seek relief against the Respondents since May 2022 when it filed the initial Motion for Recognition because the Injunction Order had already been entered in the Brazilian Proceeding. Nevertheless, the Foreign Representative served none of the Respondents with the Chapter 15 petition or the Motion for Recognition.  In the days leading up to the Court's entry of the Recognition Order, the Foreign Representative served only the Office of the United States Trustee, the Foreign Representative, and the Foreign Representative's counsel.  *See*, *e.g.*, [ECF Nos. 5, 7, 9].  Similarly, the Recognition Order itself was only served on those same parties. [ECF No. 11]. Only a year and a half later, on October 19, 2023, when the Foreign Representative filed the instant Motion did it serve any of the Respondents—and it did not even serve them all. [ECF No. 17].  Of the 15 Respondents the Foreign Representative seeks relief against in the Motion, only 11 were served.  *See id.*  The following Respondents were not served: (1) TOG Brazil, (2) Mr. Hahn, (3) Masayuki Hosaka, and (4) Makoto Watanabe.  *See id.*  This alone warrants denial of the Motion.

43.     Again, with respect to the TOG Parties, the Foreign Representative only served them *after* undersigned counsel reached out to the Foreign Representative to discuss the Chapter 15 case.

11

**B.      THE COURT SHOULD NOT RECOGNIZE THE INJUNCTION ORDER.**

   **i.      The Foreign Representative Has Failed to Substantiate Recognition of the Injunction Order.**

44.      While the Court granted the Order recognizing the Brazilian Proceeding pursuant to section 1517 of the Bankruptcy Code, this does not mean that the Foreign Representative is relieved of its obligation to make the appropriate showing that other orders from the Brazilian Bankruptcy Court should be recognized, including the Injunction Order.

45.      Section 1509 of the Bankruptcy Code provides that if a court grants recognition under section 1517, then the court shall grant comity or cooperation to the foreign representative. 11 U.S.C. § 1509(b).  But the reference to comity in section 1509 of the Bankruptcy Code "does not equate the foreign representative with the foreign court or the foreign proceeding."  *In re OAS S.A.*, 533 B.R. 83, 99 (Bankr. S.D.N.Y. 2015); *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 109 (Bankr. S.D.N.Y. 2012) ("While this provision [Section 1509(b)] mandates courtesy and respect for the foreign proceeding, consistent with the statement of purpose of chapter 15 and its international origin, it does not mandate relief. The foreign representative must still make a case that the relief it seeks is warranted.") (quoting 8 COLLIER ON BANKRUPTCY ¶ 1509.02)).

46.      Moreover, the Court's determination that comity should be granted to the foreign main proceeding does not "mandate comity with respect to all acts in the foreign proceeding without regard to the satisfaction of the other provisions of chapter 15 that pertain to comity."  *In re OAS S.A.*, 533 B.R. at 99.  In other words, it remains the burden of the Foreign Representative to show that comity should be afforded other orders of the Brazilian Bankruptcy Court, including the Injunction Order.

ii.     **The Interplay Between Sections 1521 and 1507 of the Bankruptcy Code.**

47.     Section 1521(a) of the Bankruptcy Code provides that, following recognition of a foreign proceeding, the court may grant "any appropriate relief" and provides a non-exhaustive list of potential relief which a foreign representative may seek.  11 U.S.C. § 1521(a).  The Foreign Representative is moving under section 1521(a)(7), which is a catch all and provides that a court may grant "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a)(7).

48.     The Foreign Representative also moves for relief under section 1507(a) of the Bankruptcy Code, which provides that "[s]ubject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507(a). Pursuant to section 1507, the court may grant "additional assistance" provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b).  *Id.*

49.     The relationship between section 1521 and 1507 "is not entirely clear." *In re Rede Energia S.A.*, 515 B.R. 69, 90 (Bankr. S.D.N.Y. 2014).  However, courts have determined that the proper way to address these statutes is to first consider the specific relief enumerated under section 1521(a) and (b).  *In re Condor Flugdienst GmbH*, 627 B.R. 366, 374 (Bankr. N.D. Ill. 2021).  If the relief is not explicitly provided therein, a court may then consider whether the requested relief falls under section 1521(a)'s grant of "any appropriate relief."  *Id.*  "Appropriate relief" is that which could be previously obtained under chapter 15's predecessor statute, section 304.  *Id.*  Only if a court determines that the relief requested was not available under section 304 previously should the court consider providing "additional assistance" pursuant to section 1507 of the Bankruptcy

13

Code.  *Id.*; *see also In re Rede Energia S.A.*, 515 B.R. at 93.  As the bankruptcy court in *Condor* explained, it is "obvious that if the discretionary relief sought is one of the examples set forth in section 1521(a), section 1521(a) should be used and the constraints of section 1522 adhered to." *In re Condor Flugdienst GmbH*, 627 B.R. at 374; *see also In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009) (explaining that when the relief sought is expressly provided for in section 1521 "[t]he Court need not venture into the area of 'additional assistance,' 'consistent with principles of comity' under § 1507.").

50.    Whether the Foreign Representative proceeds under section 1521 or 1507, the relief sought is subject to the limits of section 1506 of the Bankruptcy Code, which permits a court to "refus[e] to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

51.    While the relief granted in the foreign proceeding and the relief available in the United States do not have to be identical, "[t]he principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States."  *In re Rede Energia S.A.*, 515 B.R. at 91 (quoting *Bank of New York v. Treco (In re Treco),* 240 F.3d 148, 157 (2d Cir. 2001)).

### iii.    The Foreign Representative Has Failed to Establish a Basis for Recognition Based on Principles of Comity.

52.    The Injunction Order was entered *ex parte* and the Foreign Representative did not allege any specific wrongdoing by the TOG Parties.  Likewise, when the Brazilian Bankruptcy Court entered the Injunction Order, it found no particular misconduct  to justify a prejudgment freeze of the TOG Parties' assets.  Accordingly, granting the Motion to enact a prejudgment freeze on the assets of a U.S. citizen, with no alleged wrongdoing, would violate American public policy,

14

including the fundamental right to due process under the United States Constitution.  U.S. Const. amend. V.; U.S. Const. amend. XIV, § 1.

53.    "Comity is a common law rule by which courts in the United States give deference to foreign judgments."  *In re Neves*, 570 B.R. 420, 426 (Bankr. S.D. Fla. 2017), *aff'd*, No. 17-21818-CIV, 2019 WL 11288450 (S.D. Fla. Mar. 28, 2019), *aff'd*, 783 F. App'x 995 (11th Cir. 2019).  As explained by the Supreme Court in *Hilton v. Guyot*:

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, 163-64 (1895); *see also In re Enercons Virginia, Inc.*, 812 F.2d 1469, 1473 (4th Cir. 1987) (explaining that "in determining whether to apply comity to the Order of a foreign court of competent jurisdiction we must consider our own laws and public policy, as well as the rights of our residents under the laws of the United States.").

54.    To determine whether comity is warranted for a retrospective foreign court order, like the Injunction Order, the Court must evaluate:

1) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence;

2) whether the judgment was rendered by fraud;

3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just; and

4) whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings.

*In re Mouttet*, 493 B.R. 640, 655 (Bankr. S.D. Fla. 2013) (citing *Ungaro–Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

55. The Foreign Representative has the burden to show that the Brazilian Bankruptcy Court was competent and used proceedings consistent with civilized jurisprudence, is required to describe the process by which the Injunction Order was obtained, why that process is not unfair, and why it does not offend the United States' notions of justice. *In re Neves*, 570 B.R. at 426. Only after the Foreign Representative meets that burden do the Respondents have the burden of showing that the Injunction Order violates American public policy notions of what is decent and just. *Id.* at 427.

56. For the purposes of this Objection, the TOG Parties do not dispute that the Brazilian Bankruptcy Court is competent or assert that the judgment was entered by fraud. However, the TOG Parties do (1) dispute the process by which the Injunction Order was entered, (2) assert that such process is unduly prejudicial, and (3) submit that the Injunction Order's prejudgment asset freeze offends notions of what is decent and just.

57. The process by which the Injunction Order was entered offends the United States' notions of decency and justice for at least two reasons. *First*, it was entered *ex parte* without any opportunity to challenge the proceeding before the Injunction Order was entered. To obtain *ex parte* relief, the Foreign Representative asserts that it needed to show a high probability of success along with prejudice to the Foreign Representative if such relief is not granted. Motion ¶ 62. However, as described below, it is difficult to imagine how the Brazilian Bankruptcy Court could find a high probability of success sufficient to justify an asset freeze order over Mr. Hahn who is not mentioned in the Initial Pleading *or* the Injunction Order, much less how the Brazilian Bankruptcy Court could find that absent freezing Mr. Hahn's assets that the Foreign Representative would be prejudiced.

16

58.     *Second*, the Brazilian Bankruptcy Court made no findings of wrongdoing by the TOG Parties in the Injunction Order.  This alone should be sufficient to deny recognition of the Injunction Order.  It is not surprising that the Injunction Order contains no such findings because the Initial Pleading itself does not mention Mr. Hahn at all, besides identifying him as a defendant.  How can this Court recognize a prejudgment asset freeze order entered against parties who were never specifically alleged to have committed wrongdoing resulting in identifiable damages?  While this Court does not evaluate the factual findings of a foreign court, it can tell by a simple review of the face of the Injunction Order that it lacks any factual findings with respect to the TOG Parties.  *In re Neves*, 570 B.R. at 428 (reviewing factual findings of foreign court not normally appropriate for determination of comity but it was clear that the promissory notes forming the basis of judgment listed the addresses of two parties in Italy).

59.     Here, a foreign court order which is entirely devoid of factual findings with respect to Mr. Hahn cannot be granted recognition in the United States based on comity.  *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 63 (Bankr. S.D.N.Y. 1999) ("Comity should not be extended if U.S. citizens will be prejudiced by the foreign proceeding").

60.     The Foreign Representative also cites no bankruptcy cases for the proposition that an *ex parte* prejudgment asset freeze order has been granted comity like what the Foreign Representative seeks here.  The undersigned counsel has similarly been unable to locate any cases where a foreign representative in a Chapter 15 bankruptcy received recognition of an *ex parte* prejudgment asset freeze order.

61.     The Court should decline to grant comity to a non-final order, like the Injunction Order.  *In re Neves*, 570 B.R. at 427 ("comity is not routinely considered for a non-final order").  This matter is precisely the type of case where recognition is denied for a non-final order.  Indeed,

the Foreign Representative waited over a year and a half after the Injunction Order was entered to seek recognition—clearly refuting any urgency for subsequent enforcement.  Given the delay, the Court should not assume that the same urgency exists today.  The Court should assume the opposite—that the urgency no longer exists.

62.    In sum, comity is not warranted for the Injunction Order and the Court should deny the Motion.

### iv.    A Prejudgment Asset Freeze Pending Adjudication of a Claim for Damages is Not Relief a Trustee Could Obtain in the United States.

63.    Section 1521(a)(7) provides that a court may grant "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a)(7).  The Foreign Representative argues that the Injunction Order is similar to relief that could be obtained by a bankruptcy trustee in the United States.  Motion ¶¶ 73-80.  However, such relief is unavailable to a bankruptcy trustee.

64.    The Injunction Order is an *ex parte* prejudgment asset freeze entered pending an adjudication of damages in Brazil.  A bankruptcy trustee would be unable to obtain such relief here.  *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that "Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages.").

65.    In *Grupo Mexicano*, the Supreme Court rejected an asset freeze preliminary injunction pending a claim for damages.  The Supreme Court explained that permitting a prejudgment asset freeze under those circumstances would "radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences."  *Id.* at 331; *see*

*also Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1517 (11th Cir. 1994) (holding district court had no authority to issue a pre-judgment injunction freezing the defendants' assets pending trial in order to establish a fund with which to satisfy a potential judgment for damages); *Dixie Carriers, Inc. v. Channel Fueling Serv., Inc. (In re Fredeman Litigation),* 843 F.2d 821, 824 (5th Cir.1988) ("[t]he general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.").

66.     Where a party seeks an equitable remedy and not just damages, an asset freeze is permissible under *Grupo Mexicano*. *Id.* at 325. However, what the Foreign Representative seeks here is "to pierce the corporate veil and hold Respondents liable for damages." Motion ¶ 74. Moreover, the declaration of the Foreign Representative attached to the Motion makes clear that damages are what it seeks in the Veil Piercing Action: "An action to pierce the debtors' corporate veil under Article 50 of the Civil Code or Articles 82 and 82-A of the Bankruptcy and Judicial Reorganization Law has the effect of holding a non-debtor liable for damages." [ECF No. 15, Ex. 2 at ¶ 37].

67.     Even the cases relied on by the Foreign Representative in its Motion acknowledge the holding set forth in *Grupo Mexicano*. Motion ¶ 76; *In re Sledziejowski*, 533 B.R. 408, 431 (Bankr. S.D.N.Y. 2015) (recognizing that *Grupo Mexicano* held that a federal court's equitable powers do not extend to issuing a preliminary injunction pending a claim for money damages); *In re Atlas Fin. Mortg., Inc.*, No. 13-32683-BJH-7, 2014 WL 172283, at *3 (Bankr. N.D. Tex. Jan. 14, 2014) (same). Here, the Foreign Representative seeks damages for actions allegedly taken by the Respondents. As a result, this is not the type of relief for which a prejudgment asset freeze may issue.

19

68.     Moreover, while *Grupo Mexicano* makes clear that the Injunction Order at issue is not relief a bankruptcy trustee could obtain in the United States, a bankruptcy trustee also could not obtain a preliminary injunction on the facts before the Court.  In the Eleventh Circuit, a movant seeking a preliminary injunction must show:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the movant outweighs any potential harm to the party being enjoined; and (4) that granting the injunction would not be adverse to the public interest.

*Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) ("[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites.").

69.     A bankruptcy trustee would not be able to receive a preliminary injunction, because to show irreparable harm, the trustee would have to show that monetary damages will not remedy the harm.  *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990) ("Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue.").  Here, as mentioned above, the Foreign Representative seeks damages from the TOG Parties.  As such, a preliminary injunction would not and could not be granted.

70.     Moreover, a trustee seeking to freeze assets would have to show that the specific assets in question can be traced to a defendant's wrongful actions.  *AMPB Exports, Inc. v. Metal Scrap Sol., LLC*, No. 1:22-CV-04026-SEG, 2022 WL 22436412, at *5 (N.D. Ga. Oct. 14, 2022) ("a court confronted with a request for an asset freeze must consider whether the specific assets in question can be traced directly to defendants' allegedly unlawful activities.").  The Injunction Order does not identify any specific assets traceable to the Respondents' allegedly (collective)

12864351-7

wrongful actions, it simply freezes assets up to a sum certain.  Motion ¶ 29.  The granting of an "indiscriminate asset freeze," untethered to specific identified assets, is impermissible in the Eleventh Circuit.  *Id.*

71.     Furthermore, if a bankruptcy trustee brought an adversary proceeding based on the Veil Piercing Action in the United States, it would be thrown out at the motion to dismiss stage for failure to allege fraud-based claims against Mr. Hahn with particularity as required by Federal Rule of Civil Procedures 9(b).  *See W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (explaining that to plead fraud-based claims with "particularity," the Eleventh Circuit requires "a complaint identify (1) the precise statements, documents or misrepresentations made; (2) the time and place of and persons responsible for the statement; (3) the content and manner in which the statements misled the plaintiff; and (4) what the Defendant gains by the alleged fraud.").  Here, not only were there no specific allegations of fraud or misconduct against Mr. Hahn in the Initial Pleading—*there were no such allegations at all*.

72.     Contrary to the arguments of the Foreign Representative, the relief obtained in the Injunction Order could not be obtained by a bankruptcy trustee.  As such, the Court should not grant recognition of the Injunction Order pursuant to section 1521(a)(7).

> **v.     A Pre-Judgment Freeze of a United States Citizen's Property Without Findings of Wrongdoing is Manifestly Contrary to the Public Policy of the United States.**

73.     Section 1506 of the Bankruptcy Code sets forth an overriding public policy exception and provides that a court may refuse to take an action under Chapter 15 if such action "would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.  The public policy exception applies "where the procedural fairness of the foreign proceeding is in doubt

or cannot be cured by the adoption of additional protections" or where recognition "would impinge severely a U.S. constitutional or statutory right." *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 570 (E.D. Va. 2010).

74.     In observing and collecting cases analyzing section 1506 of the Bankruptcy Code the bankruptcy court in *In re Qimonda AG Bankruptcy Litigation*, observed that there are at least three principles to guide courts in analyzing whether an action taken in a Chapter 15 proceeding is manifestly contrary to public policy:

1) The mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception.

2) Deference to a foreign proceeding should not be afforded in a Chapter 15 proceeding where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections.

3) An action should not be taken in a Chapter 15 proceeding where taking such action would frustrate a U.S. court's ability to administer the Chapter 15 proceeding and/or would impinge severely a U.S. constitutional or statutory right, particularly if a party continues to enjoy the benefits of the Chapter 15 proceeding.

433 B.R. at 570.

75.     In the instant case, the procedural fairness of the foreign proceeding is in doubt and the only way it can be cured is for the Brazilian Bankruptcy Court to enter an order making findings sufficient to put the TOG Parties on notice of the wrongdoing they are alleged to have committed. The Injunction Order contains no individualized findings of wrongdoing and does not even mention Mr. Hahn (outside of directing the Foreign Representative to serve him).

76.     Moreover, as discussed previously, it would severely impinge on Mr. Hahn's constitutional right to his property and is against the public policy of the United States to grant an asset freeze against a defendant pending an adjudication of damages.  *See*, *e.g.*, *Residential Fin.*

*Corp. v. Jacobs*, No. 2:13-CV-1167, 2014 WL 682486, at *4 (S.D. Ohio Feb. 21, 2014) (as explained "by the Supreme Court in *Grupo Mexicano* . . ., granting the requested injunctive relief would harm . . . the public interest, as creditors should be required to receive a judgment before being allowed to dictate control of the property."); *RBS Citizens, NA v. M-59 Tel. Petroleum LLC*, No. 2:12-CV-11193, 2013 WL 508324, at *2 (E.D. Mich. Feb. 12, 2013) (recognizing that granting an injunction pending a trial for a money judgment is "against good public policy" by granting an interest in a defendant's property which the plaintiff does not currently possess) (citing *Grupo Mexicano*, 527 U.S. at 323).

## C. ALTERNATIVELY, EVEN IF THE COURT WERE TO GRANT RECOGNITION OF THE INJUNCTION ORDER, THE INTERESTS OF THE TOG PARTIES MUST BE SUFFICIENTLY PROTECTED.

77.     While the Court should not grant recognition of the Injunction Order for the reasons set forth above, if the Court determines that recognition is warranted, it must ensure that the interests of the TOG Parties and other Respondents are sufficiently protected.  Section 1522(a) of the Bankruptcy Code provides that the Court may grant relief under section 1521 "only if the interests of the creditors *and other interested entities*, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a) (emphasis added); *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (recognizing that discretion to grant relief under section 1521 of the Bankruptcy Code is circumscribed by section 1522(a)).

78.     Pursuant to section 1522 of the Bankruptcy Code, the Court has broad latitude to fashion relief based on the facts and circumstances presented.  As the Fourth Circuit in *Jaffe v. Samsung Electronics Co.* recognized, a bankruptcy court is authorized to subject any section 1521 relief to "conditions it considers appropriate."  737 F.3d 14, 26 (4th Cir. 2013) (quoting 11 U.S.C.

§ 1522(b)); *see also* H.R. Rep. No. 109-31(I), 116, 2005 U.S.C.C.A.N. 88, 178 (describing § 1522 as "giv[ing] the bankruptcy court broad latitude to mold relief to meet specific circumstances").

79.    The analysis under section 1522(a) is done by "balancing the respective interests based on the relative harms and benefits in light of the circumstances" of the parties before the court. *Jaffe*, 737 F.3d at 27-28. Such a balancing of interests requires a bankruptcy court to weigh "the interests of the foreign representative . . . in receiving the requested relief against the competing interests of those who would be adversely affected by the grant of such relief." *Id.* at 29; *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) ("The idea underlying [section 1522] is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief."). This analysis of section 1522(a) is conducted separate and apart from the public policy analysis under section 1506 of the Bankruptcy Code. *Id.*

80.    The Foreign Representative mistakenly argues that the TOG Parties' interests are protected because recognition of the Injunction Order "maintains the status quo" pending resolution of the Veil Piercing Action. Motion ¶¶ 82, 84. Also, the Foreign Representative wrongly suggests that recognition of the Injunction Order is urgent and essential to prevent transfer of the Respondents' assets in the United States. *Id.* ¶ 75. To the contrary, the Foreign Representative waited over a year and a half to seek recognition of the Injunction Order. Moreover, the "status quo" for the past two years has been maintained absent recognition of the Injunction Order. Instead, the Motion intends to disrupt the "status quo" with an injunction of an undefined scope and duration.

81.    The Foreign Representative also argues in the Motion that failure to recognize the Injunction Order would render it meaningless, yet there has been no indication anywhere in the

24

Motion that any of the Respondents, much less the TOG Parties, are wrongfully secreting or moving assets. *Id.* ¶ 82. The mere fact that some of the Respondents have assets in the U.S. does not make recognition of the Injunction Order urgent or necessary. The circumstances here are much different than the cases cited by the Foreign Representative where recognition was sought for a foreign reorganization plan to give effect in the United States. *Id.* at ¶ 83. Without extraterritorial recognition of a reorganization plan, the restructuring necessarily fails. Not so here. If the Court does not recognize the Injunction Order, the Foreign Representative can still obtain a judgment in the Brazilian Proceeding and move to enforce it.

82.    The Foreign Representative's purpose in seeking recognition after waiting a year and a half appears to be to exert leverage over minor parties to the matter, such as the TOG Parties (who purchased the Debtors *after* the alleged wrongdoing and who the Foreign Representative has *never* asserted took money from the Debtors). These facts further highlight the necessity for protection of the TOG Parties if the Court recognizes the Injunction Order.

83.    Pursuant to section 1522, the Court should use its broad authority to mold relief that meets the specific circumstances here, namely that (1) there were no specific allegations of wrongdoing with respect to Mr. Hahn in the Initial Pleading, (2) there were no direct findings in the Injunction Order that the TOG Parties committed wrongdoing or secreted the Debtors' assets, (3) the TOG Parties have cooperated with the Foreign Representative with respect to discovery sought to date, (4) the Foreign Representative failed to initially serve the Recognition Order or the Motion on the Respondents, (5) the Foreign Representative waited over a year and a half to seek recognition of the Injunction Order, and (6) there is no indication when the Veil Piercing Action will be decided. Taking those factors into account, the Court should not enforce any restrictions in the Injunction Order with respect to the TOG Parties.

84.     However, if the Court determines that it should recognize the Injunction Order with respect to the TOG Parties, it should limit restrictions on the TOG Parties consistent with the terms of the Injunction Order.  The Foreign Representative did not include a proposed order with the Motion to set forth the precise terms of how the Injunction Order would be utilized in the United States.  If the Court grants recognition, any such Order must hew closely to the Injunction Order itself and may not provide more relief than what the Foreign Representative obtained in Brazil.  *See In re JSC BTA Bank*, 434 B.R. 334, 337 (Bankr. S.D.N.Y. 2010) ("[A] recognition order under chapter 15 should not be the indirect means for obtaining global relief that could not otherwise have been achieved by order of the court having jurisdiction of the main foreign proceeding.").

85.     As described in the Motion, the São Paulo Appellate Court noted in its decision that the purpose of the Injunction Order is to prevent the Respondents from "engag[ing] in voluntary acts of disposal, emptying its assets to the detriment of any creditors . . . ."  Motion ¶ 38.  Per the Foreign Representative, the Injunction Order prevents "disposal of assets while permitting transactions in the ordinary course of business," *id.*, and "does not prevent the Respondents from managing and using their assets, to carry out their business and comply with their financial obligations."  *See id.* at ¶ 84.

86.     As such, any Order entered by the Court recognizing the Injunction Order must not restrict the normal use of the TOG Parties' assets, nor permit any control by the Foreign Representative over the TOG Parties' assets.  The TOG Parties must be permitted to use their assets in the ordinary course of business, comply with financial obligations, and otherwise have free reign to manage and use their assets.  The sole restriction, if any, should simply prevent the Respondents from "emptying [their] assets to the detriment of any creditors."  Motion ¶ 38.   Any

further restriction would exceed the Injunction Order's contours and significantly prejudice the TOG Parties.

87.     Additionally, to the extent the Foreign Representative seeks to hinder or delay the TOG Parties from engaging in any particular transaction using their assets the Foreign Representative be required to post a bond pursuant to section 1522(b) of the Bankruptcy Code.

## CONCLUSION

The TOG Parties respectfully request the entry of an Order denying the Motion, or in the alternative, limiting the scope and duration of any Order granting recognition as narrowly as possible to avoid any undue prejudice to the TOG Parties, and providing such additional relief as the Court deems appropriate.

Dated: March 22, 2024                    Respectfully submitted,

                                         BERGER SINGERMAN, LLP
                                         *Counsel for TOG Brazil Holdings, Inc. and*
                                         *Mike Hahn*
                                         1450 Brickell Ave., Suite 1900
                                         Miami, FL 33131
                                         Tel: (305) 755-9500

                                         By: /s/ *Justin B. Elegant*
                                                 Justin B. Elegant
                                                 Florida Bar No. 0134597
                                                 jelegant@bergersingerman.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the 22nd day of March, 2024, by electronic transmission through the Court's CM/ECF system upon

12864351-7

all parties on the attached CM/ECF Service List, and via first class, U.S. Mail to all parties on the attached First Class, U.S. Mail Service List.

By: /s/  *Justin B. Elegant*
       Justin B. Elegant

## CM/ECF SERVICE LIST

- **Nyana A Miller**     nmiller@sequorlaw.com,
  mrivera@sequorlaw.com;mcohen@sequorlaw.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **David L Rosendorf**    dlr@kttlaw.com, rcp@kttlaw.com;ycc@kttlaw.com
- **Carolina Zambrano-Goncalves**    cgoncalves@duanemorris.com,
  kahill@duanemorris.com

## FIRST CLASS, U.S. MAIL SERVICE LIST

**Gary Eisenberg**
Perkins Coie
1155 Avenue of the Americas, 22 Floor
New York, NY 10036-2711

12864351-7