Page 1

1                UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF FLORIDA
2                   WEST PALM BEACH DIVISION

3
                                     CASE NO. 22-14043-LMI
4
IN RE:
5
  NEXGENESIS HOLDINGS LTDA,
6   et al.,

7                Debtors.
_____/
8

9

10

11

12  MOTION FOR ORDER RECOGNIZING THE PRELIMINARY ASSET FREEZE
          (15) AND OBJECTIONS THERE TO (35) AND (36)
13

14                     March 28, 2024

15              The above-entitled cause came on for hearing

16  before the Honorable LAUREL M. ISICOFF, one of the Judges

17  in the  UNITED  STATES  BANKRUPTCY  COURT, in and for the

18  SOUTHERN DISTRICT OF FLORIDA, at 301 North Miami Avenue,

19  Miami, Dade County, Florida, on March 28, 2024, commencing

20  at or about 1:30 p.m., and the following proceedings were

21  had:

22              Transcribed from a Digital Recording By:
                 Anna M. Meagher, Shorthand Reporter
23

24

25

```
 1                    APPEARANCES:
 2                 Sequor Law, P.A., by
                 Nyana Miller, Esquire
 3             Maria Jose Cortesi, Esquire
        On behalf of the Foreign Representative
 4             Email:  Nmiller@sequorlaw.com
               Email:  Mcortesi@sequorlaw.com
 5
 6           Kozyak Tropin & Throckmorton, by
                David L. Rosendorf, Esquire
 7      On behalf of Rakuten USA, Inc. and Reginald Rasch
                  Email:  Dlr@kttlaw.com
 8
 9               Berger Singerman, by
                Justin B. Elegant, Esquire
10      On behalf of TOG Brazil Holdings, Inc. and Mike Hahn
             Email:  JElegant@bergersingerman.com
11
12               Perkins Coie, LLP, by
                Gary F. Eisenberg, Esquire,
13        On behalf of Rakuten USA and Reginald Rasch
             Email:  Geisenberg@perkinscoie.com
14
15                  ALSO PRESENT:
16                   Eliza Fazan
17                Thiago Junqueira
18        Jason Sebring, Chief Legal Officer
               For Rakuten International
19
              Clare McCown, General Counsel
20                 For Rakuten USA
21                   Greg Warren
22                 - - - - - - -
23
24
25
```

1             THE COURT:  All right.  Good afternoon,

2    everyone.

3             Ms. Sanabria, can you hear me?

4             MS. SANABRIA:  Yes, Judge.

5             THE COURT:  All right.  I want to apologize

6    to everyone for the scheduling issue.  Although I know

7    that many of you are probably thrilled that I had to reset

8    this remotely, I would have preferred to have had this

9    argument in the courthouse, but, unfortunately, there was

10   a scheduling snafu.  So rather than pushing this off any

11   further, we went forward remotely, much as I said to the

12   delight of many of you, I am sure.

13            All right.  For those of you who have not

14   been with me before, just a few general marching orders.

15   One, as all of you I'm sure know, even though we are in

16   the virtual courtroom, we are still in court.  So I'm

17   happy to see those of you who have turned on your cameras

18   are dressed properly for court.  If you're not dressed

19   properly for court, good for you, but don't turn your

20   camera on.

21            If you are riding in a vehicle or, God

22   forbid, driving in a vehicle or even walking around,

23   please do not turn your camera on.  In fact, if you're

24   driving a vehicle, please pull over and be in a safe space

25   to attend the hearing.

1              Please remember to speak slowly and clearly.

2     We do not have court reporters, so the recording is our

3     record.  Please do not interrupt each other.  Everyone

4     will have the opportunity to speak.  Just raise your hand

5     virtual or actual, and if I don't see you, my law clerk

6     will, and as soon as the person who is speaking has

7     concluded his or her remarks, then I will invite you to

8     speak further.  I think that covers everything.

9              You do not have to spell your last name for

10    the record, because you all presumably spelled your names

11    correctly, although I am going to guess that Crisomhouse

12    (phonetic) West is not the gentleman's name.  So you can

13    either change your name, or you can spell your name for

14    the record when you make your appearance.

15             All right.  So we'll get started then, and

16    I'll start with Ms. Miller.

17             Ms. Miller, please make your appearance.

18             MS. MILLER:  Good morning, your Honor.

19    Nyana Miller.  I'm here with my colleague, Maria Jose

20    Cortesi on behalf of the foreign representative.  We also

21    have Eliza Fazan from the foreign representative's office

22    and several of our Brazilian colleagues, and Thiago

23    Junqueira who filed the declaration in this matter.

24             THE COURT:  All right.  Thank you all very

25    much and welcome.

1           And, Ms. Miller, I'm getting a little bit of

2    an echo, so I'm going to ask you to get a little closer to

3    your microphone to perhaps have the echo go away.

4           All right.  So we have Ms. Cortesi, who is

5    your co-counsel, Ms. Fazan, who is with the

6    administrator's office, I believe you said, and Ms. De

7    Fonseca (phonetic) is the one who signed the affidavit.  I

8    don't have it pulled up in front of me right now.  Oh,

9    Mr. Junqueira, Junqueira, was the one who signed the

10   affidavit.  Okay.

11          All right.  Well, welcome to all of you.

12          All right.  He who is not Crisomhouse West,

13   please make your appearance.

14          MR. SEBRING:  Sorry about that.  Our

15   conference room equipment doesn't allow me to change the

16   name, but my name is Jason Sebring.  It's S-E-B-R-I-N-G,

17   and I'm the chief legal officer for Rakuten International.

18          THE COURT:  Okay.  Chief legal officer,

19   Rakuten International.  Welcome, sir.

20          MR. SEBRING:  Thank you.

21          THE COURT:  Ms. McCown.

22          MS. McCOWN:  Hi.  Clare McCown, I'm general

23   counsel for Rakuten USA.

24          THE COURT:  All right.  Mr. Elegant.

25          MR. ELEGANT:  Hello, your Honor.  Justin

1   Elegant from Berger Singerman.  I'm here on behalf of TOG

2   Brazil Holdings, Inc. and Mike Hahn, and I'm with client

3   representative, Greg Warren is here as well.

4                   THE COURT:  Okay.  And Mr. Warren is in your

5   office or -- oh, I see, Mr. Warren, yes.  Okay.  Welcome,

6   Mr. Warren.

7                   MR. WARREN:  Thank you.

8                   THE COURT:  All right.  TOG rep, okay.

9                   All right.  We have Ms. Cortesi already.

10                  Mr. Eisenberg.

11                  MR. EISENBERG:  Good afternoon, your Honor.

12  Gary Eisenberg, Perkins Coie, LLP, admitted pro hac vice

13  on behalf of Rakuten USA and Reginald Rasch.  Also my

14  colleague, Sean Solis, is listening in, although he's not

15  been admitted pro hac, and he will not be speaking in

16  connection with this motion, but he is also on camera, on

17  screen, and as you can see, dressed for court, your Honor.

18                  THE COURT:  Welcome, Mr. Solis.

19                  All right.  We have Ms. Iwamoto.

20                  MS. IWAMOTO:  Hi, your Honor.  Yes, I'm from

21  Pinheiro Neto Advogados.  I'm the Brazilian counsel to the

22  foreign representative as well, along with Mr. Chinkata

23  (phonetic).

24                  THE COURT:  Okay.  Thank you.  Welcome.

25                  MS. IWAMOTO:  Thank you.

1          THE COURT:  All right.  Mr. Rosendorf.

2          MR. ROSENDORF:  Good afternoon, your Honor.

3  David Rosendorf, Kozyak, Tropin & Throckmorton, on behalf

4  of Rakuten USA, Inc. and Reginald Rasch.  As Mr. Eisenberg

5  noted, I'm appearing here with my co-counsel,

6  Mr. Eisenberg, his colleague Sean Solis, and we have a

7  number of client representatives, some of who am I believe

8  have already identified themselves, Ms. McCown, as well as

9  I see Alex Moe (phonetic), as well in the list of parties

10  that are attending.

11          THE COURT:  Okay.  Thank you very much.

12          All right.  No one else's cameras are on, so

13  I'm going to guess they do not wish to make an appearance,

14  which is fine.  But if you do wish to make an appearance,

15  please either turn your mute button off, and I can see

16  that you've unmuted yourselves or turn your camera on,

17  either one is fine.  If I don't see that, then I'll assume

18  no one else is making an appearance.

19          All right.  So we're here today on the

20  motion for order recognizing the preliminary asset freeze.

21  I've reviewed the two objections.  I've reviewed the

22  notice of filing of the Junqueira declaration.

23          So, Ms. Miller, it's your motion.  I did not

24  see a reply as late as mid-morning today, so I'm assuming

25  that in your presentation, you'll address the issues

```
 1    raised in the responses or the objections.

 2                 And in doing so, I would also like you to

 3    spend a little bit of time on the Grupo Mexicano issue as

 4    well as the personal jurisdiction over the objectors at

 5    the time the initial order for which you seek recognition

 6    was entered.  Okay?

 7                 MS. MILLER:  Thank you, Judge.  And at least

 8    your Honor has already read my outline, so I did have

 9    three main issues that I wanted to cover in my main

10    remarks.

11                 THE COURT:  Okay.  I'm still having trouble

12    hearing you.  One of the many reasons why I really didn't

13    want to have this remotely, and I'm so sorry, but let's

14    see what we can do.

15                 MS. MILLER:  Is that any better?

16                 THE COURT:  Yes, that's much better.

17                 MS. MILLER:  I changed main speaker.  I

18    meant to change my mic.  How's this?

19                 THE COURT:  Much, much better.

20                 MS. MILLER:  All right.  It was on the wrong

21    microphone.

22                 So thank you for those remarks, your Honor.

23    Yes, given the late and very voluminous filings, I chose

24    not to file a written reply, but I have read the

25    responses, the objections, and certainly your Honor has
```

1   hit on the two main legal issues in this case, the Grupo

2   Mexicano and due process generally and, in particular, the

3   personal jurisdiction.

4              So if I could back up before I hit on those

5   two important issues, I think as far as the general

6   framework for a decision with respect to whether to grant

7   comity to a interlocutory preliminary injunction in a

8   foreign case, in general terms, at least we're -- I think

9   we can all agree on the precedent, the rules that are in

10  play, the -- you know, the main principles, with one

11  exception.

12             In Rakuten's objection it raises arguments

13  about this not being a foreign proceeding, and so with

14  respect to that, I just want to take a moment, you know,

15  before we get into the other issues to talk about the fact

16  that we are not seeking separate, you know, 1509

17  recognition for the veil piercing incident or the veil

18  piercing adversary proceeding.  So, you know, we're --

19  recognition of the insolvency, i.e. the Brazilian

20  bankruptcy case, has been granted, and within that we are

21  seeking additional relief under 1521(a) and in the

22  alternative relief under 1507.  So this is not a question

23  of the type of proceeding.  It's certainly -- and I don't

24  think this Court wants to be the first court to hold that

25  an adversary case or an incident file, as they call it in

```
 1    Brazil, is not part and parcel of the bankruptcy, right?
 2    It is simply filed under a separate file, just like an
 3    adversary is.  And, of course, if the roles were reversed
 4    and this Court entered an order in an adversary
 5    proceeding, it would certainly expect and hope that a
 6    court in Brazil, sitting in an ancillary capacity, would
 7    grant recognition to this Court's orders granted in an
 8    adversary proceeding.  So that's the procedural posture
 9    that we find ourselves in.  And --
10              THE COURT:  Well, let me stop you for just a
11    minute then.  So just to clarify, because I certainly,
12    when I initially read your pleading, had the same thought.
13    It's, like, how am I recognizing an order -- any order,
14    any order, regardless of whether it was interlocutory or
15    not?
16              So what I'm understanding is you're saying
17    when you look at 1521(a) and you look at the enumerated
18    relief (1) through (7), what you're saying is you're
19    looking for relief as one of the enumerated reliefs
20    presumably?  I'm not quite sure which one, since none of
21    them seems to apply, but you'll walk me through that and
22    tell me which one does.  Okay?
23              MS. MILLER:  Yes.  We are pointing to number
24    (7), and also to the general language that says that
25    any -- that the Court has the power to grant any relief
```

1    necessary for the purposes of the proceeding, and then

2    number (7) is any additional relief that may be available

3    to a trustee.  And so that's what we're here talking about

4    today.

5              THE COURT:  Okay.

6              MS. MILLER:  So the general principles as

7    far as, you know, when to grant comity to a foreign order

8    were sent down long ago by the Hilton versus Guyot case,

9    more recently discussed by the Eleventh Circuit in the

10   Daewoo case, and I think all of the parties agree as to

11   the general elements that this Court should be looking to.

12   Number one, whether the foreign court was competent and

13   used proceedings that are consistent with civilized

14   jurisprudence.  Number two, whether the judgment was

15   rendered by fraud, and, number three, whether the foreign

16   judgment was prejudicial because it violated American

17   public policy notions of decent and just.

18              So if we could, I guess, talk about the --

19   the newest or newer, newer than Hilton, U.S. Supreme Court

20   decision.  I think that the Grupo Mexicano is obviously

21   kind of a gateway issue for this Court, and the question

22   really is whether pre-judgment preliminary relief

23   violates, you know, this U.S. Supreme Court precedent.

24              So it's important to hold -- to understand

25   what that court held, what that case held.  And in

1    particular it was looking at and holding that district

2    courts lack equitable power to enjoin a pre-judgment

3    transfer of assets in an action at law.  So in that case,

4    the creditors, I think they were bondholders, brought a

5    contract claim for money damages in District Court while

6    the bankruptcy was going on.  So they chose not to go to

7    Bankruptcy Court and were trying to go straight to a

8    breach of contract action.

9              The Supreme Court in that case reversed the

10   lower court's preliminary injunction, and it distinguished

11   that case from a prior precedent, the United States versus

12   First National City Bank, in which the Supreme Court had

13   previously held that a federal court can issue

14   pre-judgment asset freeze orders.  And the important

15   distinction was that the injunction in the First National

16   case was authorized by federal statute.  The pre-judgment

17   asset freeze in Grupo Mexicano, on the other hand, had no

18   statutory authority, rather the District Court had granted

19   the injunction under its general equitable powers in an

20   action at law.

21             Again, so the Supreme Court also suggested

22   that bankruptcy law itself might provide the authority to

23   issue pre-judgment asset freezes.  So addressing the need

24   to have a remedy to stop debtors' attempts to avoid paying

25   creditors, the court noted, quote, "The law of fraudulent

1    conveyances and bankruptcy was developed to prevent such

2    conduct.  An equitable power to restrict a debtor's use of

3    his unencumbered property before judgment was not," end

4    quote.

5             And so in this particular case, section 1501

6    and section 1507 of the Bankruptcy Code do provide

7    specific statutory authority for the relief requested.

8    And, alternatively, even if those provisions of Chapter 15

9    do not provide the direct statutory basis for a

10   pre-judgment injunction, there is, nonetheless, equitable

11   power to do so under section 105 of the Bankruptcy Code.

12             I don't have the cases at-hand

13   unfortunately, but there are a couple of cases, I think.

14   One out of the Third Circuit and one out of the Ninth

15   Circuit finding that equitable injunctions entered under

16   section 105 do not violate the Grupo Mexicano decision.

17             In this case, in particular, we have an

18   action in comity.  It's -- so it's also relevant that the

19   Brazilian court was also exercising its own equitable

20   powers in the veil piercing action.  So it was not a

21   breach of contract claim as we saw in Grupo Mexicano, but

22   it was piercing the corporate veil, and that is indeed

23   something that American courts consider equitable

24   jurisdiction.  So under this analysis, Grupo Mexicano does

25   not bar a comity injunction under the Bankruptcy Code in

```
 1   aid of the Brazilian court's preliminary injunction in the
 2   veil piercing action.
 3              THE COURT:  Well, let me ask you a question
 4   before we even get to the personal jurisdiction issue.
 5              When I read the order of the Brazilian court
 6   that was attached to your original motion -- and let me
 7   pull it up here.  I meant to have it pulled up beforehand,
 8   but I did not, so give me one moment.
 9              That was what, Exhibit 1, to your original
10   motion?
11              MS. MILLER:  Yes.
12              THE COURT:  The exact language in that
13   order -- and perhaps I saw it in your pleading and not in
14   the exhibit -- did not appear to be a direct injunction,
15   per se.  This is not necessarily something that was
16   addressed by either objector, so let me just find the
17   paragraph.  I'm trying to find the paragraph.  I think it
18   was in your pleading where you quoted that a judicial --
19   the foreign -- the administrator is able to go to the
20   United States -- I'm just trying to find that language.
21              Is it in this order?
22              MS. MILLER:  Yes, your Honor, in the CM/ECF
23   filing, it's 15-1, page 4.
24              THE COURT:  Page 4, okay.
25              "In relation to procedures abroad, I
```

1    authorize the filing by the bankruptcy estate of the

2    appropriate and necessary procedures, including in the

3    United States of America, so that the decisions handed

4    down in the Brazilian courts are recognized and complied

5    with, as well as with the adoption of procedures that may

6    be necessary, so that the order of preliminary attachment

7    and freezing of cash and all other assets of the

8    defendants, including the trademarks they own, is also

9    complied with by the respectable" -- I guess "respective,"

10   right?  Or maybe we are respectable, I would hope so --

11   "foreign jurisdiction in relation to assets and valuables

12   under the jurisdiction of those countries."

13            So when I read that paragraph, I did not

14   read it as necessarily being an injunction, per se, but

15   more along the lines of what I had to deal with in my

16   Laspro case, where there was an argument that the

17   Brazilian bankruptcy court had not authorized the foreign

18   administrator to bring any actions in the United States

19   with respect to the action that happened to be before me.

20   And there -- it turned out that -- I don't want to say

21   "misrepresented," but that it was miss -- misunderstood by

22   the person making such argument.  And so I read this

23   paragraph as merely giving the foreign administrator the

24   authority to come to this Court and seek whatever relief

25   is appropriate from this Court to freeze those assets, not

1   necessarily that that order in and of itself is even

2   viewed by the Brazilian court as the operative document

3   that would freeze assets of United States citizens located

4   in the United States.

5           So I'm a little confused about whether --

6   even if I grant comity to this order, what that actually

7   means.  Do you understand what I'm saying, Ms. Miller?

8           MS. MILLER:  Yeah.  So I think the Court's

9   interpretation of the language is correct.  This is an

10  authorization for the foreign representative to come here

11  and to seek comity.  But I think the comity that this

12  Court would be granting is not a comity as to that

13  particular paragraph, since that particular paragraph

14  doesn't obligate anyone to do anything.

15          This Court would be granting comity as to

16  the preceding paragraphs, the -- what it calls preliminary

17  attachment in Brazil would be conducted via

18  (unintelligible).  So the objective always is to translate

19  these legal terms into something that makes sense in

20  America, right?  But what they were doing in Brazil was --

21  was a procedure where they tell this centralized banking

22  system that money can't leave these accounts without

23  judicial permission, right?  So that was Point A.

24          Point B was an attachment of trademarks and

25  patents.  That's also particularly difficult here, because

```
 1    our trademark office doesn't maintain a centralized, you
 2    know, database of liens on patents, but perhaps just
 3    something recorded in the public registry that they are
 4    not to transfer or sell their patents, their trademarks.
 5              And then item C is really the important one,
 6    which is the attachment of the defendants' assets, so to
 7    essentially make assets inalienable, right?  So they can't
 8    sell real estate; they can't sell shares in companies that
 9    they may own, you know, without judicial permission.  Of
10    course, all these things are subject to that.
11              The final one relates to the burden of
12    proof.  It's a little bit obscure, but so that one is not
13    so much relevant to this Court, I think.
14              THE COURT:  No, no, I understand that.  I
15    still don't read the paragraph that way.  I understand
16    what the order does.  I mean, I don't -- as much time in
17    my three days in Sao Paulo that I feel I became an expert
18    in Portuguese, I understand -- I know I have to rely on
19    English translation, but I understand what all that says.
20              Okay.  But carry on.  Let's assume that this
21    order says what it says you say it says, that somehow this
22    court, the Brazil court, has the power to enter orders
23    against persons over whom they do not have personal or in
24    rem jurisdiction, and which, of course, brings you to the
25    other problem that you have, right?  But, okay, so your
```

1    belief is that notwithstanding that a District Court, an

2    Article III court, was not allowed by the United States

3    Supreme Court to enter a pre-judgment writ of attachment,

4    that notwithstanding that, that I, an Article I court,

5    with my incredible super powers that are regularly

6    recognized by the Supreme Court as being superior to that

7    of any Article III court, that I can do what an Article

8    III court can't.  Got it.  Noted.

9               What else do you want to tell me about Grupo

10   Mexicano --

11              MS. MILLER:  It did include that very

12   helpful dicta that said that you do have equitable powers,

13   so I will hang my hat on that.

14              THE COURT:  All right.  I'm going to write

15   that down, dicta, super powers by Bankruptcy Court.

16              Okay.  Go ahead.

17              MS. MILLER:  So, you know, does this action

18   fit within the 1521(a)(7), we would hold that it does, and

19   we do cite cases where the courts are granting asset

20   freeze injunctions under -- the bankruptcy courts are

21   granting asset freeze injunctions under the section 105

22   powers.  So, you know, this is relief that is available to

23   trustees.  It's not, of course, regularly exercised, but

24   that's not what the inquiry is.

25              The inquiry under Section 1521(a) is whether

1  the relief is of the type available to a trustee, and we

2  hold that it is.  We cite cases showing that it is.  You

3  know, so that's what we're asking this Court to do, is to

4  also enter an asset freeze similar to the ones entered in

5  those cases.

6                    THE COURT:  Okay.  I would like you to

7  specifically address the cases cited by the objecting

8  parties that disagree with your position that the trustee

9  does have the authority either under applicable bankruptcy

10 law or applicable nonbankruptcy law.

11                   MS. MILLER:  Well, there's certainly a lot

12 of them.  I don't know if the Court wants me to go through

13 them one by one, or if it might be helpful to do a

14 supplemental --

15                   THE COURT:  Well --

16                   MS. MILLER:  -- briefing on them.

17                   THE COURT:  -- I just want a general -- I

18 would like to have a general -- no, I don't want you to

19 sit here right now, we only have an hour after all.  But

20 I -- what I really am trying to ask you to do is to

21 explain to me why you believe the cases upon which you

22 rely are not -- are those that I should be persuaded by,

23 notwithstanding the problems with those cases raised by

24 the Rakuten USA objection and the TOG/Hahn objection.

25                   MS. MILLER:  Well, so I would point first of

1    all to the number of state law arguments made.  I think

2    it's important for this Court to distinguish the state law

3    about recognizing final judgments and determining that

4    interlocutory judgments, for example, are not recognizable

5    under the Uniform Foreign Money Judgment Recognition Act,

6    right?  It's been enacted in several states.  Rakuten

7    talked about the Act under Florida law, under California

8    law, I believe under New York law as well.  That's all

9    well and good, and that's undisputed.  And there is a

10   whole line of cases out there -- and a majority of the

11   cases that they cite, particularly when they're talking

12   about a finality point, those cases are dealing with the

13   concept that comity can be mandatory under certain

14   circumstances, right?  And in particular as it's been

15   codified in the Money Judgment Recognition Act.

16                So it is undisputed and it is quite true

17   that if you can check all of the boxes under the Act, you

18   have a valid money judgment for payment of a sum certain,

19   it is final, it is ex -- you know, enforceable and it's

20   conclusive, the courts under those laws, which have been

21   passed in a majority of states, must recognize them.  That

22   is not discretionary.  But that's not the jurisdiction

23   that we're invoking in this case.  So all of those cases

24   are distinguishable on those grounds.

25                We're not telling this Court that it must

1   recognize an interlocutory injunction.  We are saying that

2   it "may" recognize an interlocutory injunction.  It may

3   grant comity to -- and I suppose "recognition," I realize

4   I used that word in the title of the motion, it's probably

5   not the best way to recognize -- to describe what we're

6   asking this Court to do, right?  Because we just talk

7   about the Court needs to do some translation in figuring

8   out what the American equivalent of that relief would look

9   like and how to articulate that relief in American terms.

10  But we are asking this Court to issue an injunction in

11  comity, and not under Florida law and not under state law,

12  not under federal American law; and recognizing that the

13  requirements for getting an injunction in Brazil and under

14  Brazilian law are different, but that due process was

15  still complied with.

16          You know, notwithstanding the statements

17  made, you know, by the parties, they are subject to

18  Brazilian law.  They did avail themselves of the privilege

19  of doing business in Brazil.  They were shareholders,

20  Rakuten and TOG.  Mr. Hahn was the person who signed all

21  the documents.  He was the principal of TOG.  So he was,

22  essentially, TOG and his interrelation cannot be denied.

23  So, you know, when a Brazilian court acts with

24  jurisdiction, and it did act, you know, under principles

25  of due process.  Notwithstanding the fact that their

Page 22

1    substantive law is different than American substantive

2    law, it is appropriate and we ask this Court to exercise

3    its discretion to recognize it, notwithstanding that it's

4    not mandatory.

5              THE COURT:  Okay.  So I did not see anywhere

6    in your pleadings, and so I will invite you now, because

7    unfortunately or fortunately, as my law clerk and my

8    intern, Ms. Valcam (phonetic), who you see attending by

9    video today, we just had to do a very, very deep dive into

10   personal jurisdiction in the United States over a foreign

11   entity, which entity argued unsuccessfully for the entity,

12   but for reasons unrelated to what we are here for today,

13   but citing many cases for United States minimum contacts

14   that merely being a shareholder, all right, merely owning

15   stock in a company is not enough to establish minimum

16   contact.

17             So am I hearing you say that I need to

18   determine, using Brazil law, what constitutes a minimum

19   contact, as opposed to using U.S. law when I'm looking at

20   the standards that are articulated by Chapter 15, as well

21   as the general rules of comity as to when it is

22   appropriate to allow a foreign court to exercise personal

23   jurisdiction, or even in rem jurisdiction, over

24   noncitizens of the United States?  And, again, if it has

25   to just do with the shares that were located in Brazil or

Page 23

1    assets located in Brazil, we're having a different

2    discussion regarding in rem jurisdiction, but we're not

3    even talking about assets located in Brazil.  We're

4    talking about extraterritoriality with respect to assets,

5    in rem jurisdiction, and we're also talking about

6    exercising jurisdiction over U.S. citizens or U.S.

7    entities.

8              So which minimum contacts do I need to apply

9    or should I apply, Ms. Miller?  And, moreover, what is the

10   law in Brazil?  Is it we can exercise our jurisdiction

11   over anyone we want?  And if they don't come into the

12   jurisdiction to exercise their post-ex-parte proceeding

13   protections, to bad, so sad?

14             I mean, so this is what I want to understand

15   from you as to this.  And I will say that I'm asking a lot

16   of questions today, and I know we're not going to finish

17   in the hour, and it may be that the people that have a

18   2:30 are just going to have to wait.  Maybe they'll learn

19   something.  They could all use it.  Don't tell them I said

20   that.

21             But I want to understand what standard do

22   you think I should be applying?  And if it's Brazil, what

23   is the standard in Brazil, if it's not just a

24   free-for-all?

25             MS. MILLER:  So the standard for a court

Page 24

1    sitting in comity is a constitutional standard under
2    American law, right?  So the American court must determine
3    whether the foreign court gave -- I forget what the -- let
4    me find the language.  But whether it -- it was consistent
5    with civilized jurisprudence, and we see the
6    constitutional due process analysis, including the
7    constitutional minimum contacts analysis, used in those
8    cases in comity.  What we don't see courts in comity
9    superimposing our, like, state law standards, right?  Long
10   arm statutes are not applicable to an action in comity.
11              So with that said we are not looking here at
12   general jurisdiction in particular for Rakuten USA.  I
13   think it's important to say that nobody ever claimed
14   Rakuten Group, Inc., the parent company that undisputedly
15   did exercise direct control over the subsidiaries in
16   Brazil and was the majority shareholder, nobody says that
17   that company didn't avail itself of the privilege of doing
18   business and isn't subject to general jurisdiction, right?
19   So now --
20              THE COURT:  I don't think that -- did I miss
21   something?  I don't think RGI is one of the parties here,
22   correct?
23              MS. MILLER:  No.
24              THE COURT:  We're talking Rakuten USA and
25   their former general counsel.

1          MS. MILLER:  Rakuten Group, Inc. didn't file

2     anything in this case.  But, interestingly, in certain

3     places in the Rakuten USA's objection -- they generally,

4     overall, in most places refer to themselves as Rakuten

5     USA.  But in specific instances, they only say "Rakuten,"

6     which I take it to mean that they are talking about the

7     entire group.  So they are attempting to assert certain

8     rights for their parent company.

9          THE COURT:  I'm going to stop you.  And this

10    is a message from Mr. Rosendorf and Mr. Eisenberg.

11          I'm treating this as Rakuten USA only.  I am

12    not getting into Rakuten Group, Inc., okay?  And the whole

13    thing about the raid on marketing and all of that, I --

14    whatever, I'm calling it a "raid," that's because I think

15    that's what they called it.  We're not going there.  Okay?

16          I want to focus on Rakuten USA, Mr. Rausch

17    (phonetic), Rasch -- I'm not quite sure how to pronounce

18    his name -- Mr. Hahn and TOG, okay?  So we're talking

19    about specific jurisdiction, again, I know much more about

20    that than I really want to right now, but it's all still

21    fresh in my brain, okay?  So we're talking about specific

22    jurisdiction, minimum contacts.  So let's talk -- let's

23    start with Rakuten USA.

24          So Rakuten USA, do you dispute factually

25    that they own .001 percent of Rakuten Holding?  Is that a

1    factual dispute?

2              MS. MILLER:  I don't believe that's a

3    dispute, your Honor.

4              THE COURT:  Okay.  Other than Mr. Hahn

5    signing all the documents on behalf of TOG, is there any

6    other basis upon which you'd be saying that there was

7    specific jurisdiction over him?

8              MS. MILLER:  Well, Mr. Hahn, you know, in

9    the papers in Brazil, he was the one performing all of the

10   acts, not just signing documents, but performing all acts

11   on behalf of TOG Brazil.  So he was the decision maker,

12   and he was the principal.  He chose to get involved in

13   this deal, and he did carry out the acts on behalf of the

14   company.

15             THE COURT:  Okay.  And on TOG, TOG, what is

16   that, that they purchased the stock and they were the

17   stockholder at the time?

18             MS. MILLER:  They were the stockholder, and

19   they were the ones that put the company into insolvency.

20   So there are several facts, for example, that were set out

21   in the judicial administrator's reports to the Court about

22   closing the companies and in the motion.  So if the Court

23   is inclined to get deeper into those we can certainly

24   translate those documents.  They were not attached to our

25   motion, because they are quite voluminous.  I think the

Page 27

1    administrator's report was maybe, approximately, 200 pages

2    and the initial motion was 95 pages, I believe.  So we can

3    certainly bring all of those details here.  But that's the

4    reason why they weren't included and just some certain

5    relevant quotes were included through the declaration.

6              THE COURT:  Okay.  Just remember, we're

7    talking about the constitutionality of enforcing

8    jurisdiction over noncitizens and nonresidents, and I

9    appreciate that you're acknowledging that it's specific

10   jurisdiction, not general jurisdiction.  But I still need

11   to have some type of contest, assuming you get past Grupo

12   Mexicano, to even determine whether it was appropriate for

13   the court in Brazil to enter this order.

14             I'm not getting into -- I would like to

15   avoid, if I can, having to go into an entire evidentiary

16   black hole, but I'll do it if it ends up being necessary,

17   as to the allegations about the Brazil courts -- having

18   met many of the judges of the insolvency court and not

19   quite sure which court is the one, because it doesn't seem

20   to me that it was the insolvency judges that entered this

21   order.  It looks like this judge is from a different court

22   on a matter that's appended or incidental to --

23             MS. MILLER:  This is the bankruptcy judge.

24   It's the same judge who handles the main bankruptcy case.

25   It recently changed, but the judge who was handling the

```
1    main case also handles the adversaries, incident --
2               THE COURT:  All right.  Got it.
3               Well, all right, so certainly if we had to
4    go down that road that would require an incredibly robust
5    adversary -- I mean, an evidentiary hearing.  And I don't
6    think that's the highest and best use of anybody's time,
7    and certainly not a position that this court here wants to
8    put itself in if it absolutely does not have to, only
9    because of this Court, meaning myself and other the other
10   bankruptcy judges of the Southern District of Florida,
11   have dealt with insolvency orders and Chapter 15 petitions
12   from Brazil for many, many years.  And to my knowledge
13   this is the first time that anyone has suggested that any
14   of those judges have -- lack any type of integrity.  And
15   so that would require an incredibly robust proceeding and,
16   frankly, not one that I am likely to believe is
17   appropriate to enter into without some very strong, strong
18   evidence to support those allegations, not just, "Look
19   what happened to Rakuten Marketing, isn't this terrible?"
20              Okay.  All right.  So we now have that you
21   believe that there's sufficient findings somewhere in a
22   document that hasn't been translated yet that would
23   somehow justify the exercise of minimum contacts.  And, of
24   course, that's only the first half of the international
25   shoe, right.  It's, one, minimum contacts, two, fairness,
```

1    okay?  So you believe you have enough to support a finding

2    that that would be appropriate.

3                    So what else do you want to tell me about?

4                    MS. MILLER:  I guess on the fairness point,

5    you know, it was TOG Brazil, it was a special purpose

6    entity that was incorporated by Hahn and by TOG here in

7    the United States, specifically to operate companies in

8    Brazil, so it existed to go down to Brazil and to perform

9    business there.  So it certainly doesn't violate

10   fundamental notions of fairness that when you go to Brazil

11   to do business that you could be hauled into court in

12   Brazil, of course, and subject to Brazilian law.

13                    THE COURT:  Fair point.  Okay.

14                    All right.  What else?

15                    MS. MILLER:  Those were the main points that

16   I want to cover.  I'm conscious of the fact that we only

17   have an hour for this hearing, so I wasn't planning on

18   launching into every single sub-issue.

19                    THE COURT:  Okay.  No, no, that's fine.

20   Because I will tell you surprise, surprise, I'm going to

21   ask you all to submit competing orders at the end of this

22   argument, so.

23                    All right.  So let me go next to

24   Mr. Elegant.  So, Mr. Elegant, are you going to be the one

25   arguing on behalf of TOG and Hahn?

Page 30

1            MR. ELEGANT:  Yes, your Honor.  We -- before
2    the hearing, I'd spoken to Mr. Rosendorf, and we had
3    planned an order to respond.  If we can proceed in that
4    regard, that's the way we would.  However, your Honor, if
5    you have specific questions, I plan to follow him, and
6    Mr. Rosendorf has split his material with Mr. Eisenberg,
7    so we had spoken beforehand just to be organized for your
8    Honor, and that's the order we came to.
9            THE COURT:  That's fine.  I'm --
10           MR. ROSENDORF:  And, your Honor, it won't
11   surprise you to learn that I'm always very happy to speak.
12           THE COURT:  (Laughter.)  Well, it's
13   always -- as I say to my law clerk and my intern many
14   times, we watch proceedings to see what one should not do,
15   lawyers, and I want to tell them all publicly now that
16   with this group here today, these all going to be the
17   people that you want to emulate when you go out to
18   practice law.
19           So please, Mr. Rosendorf, go ahead and
20   present your argument.  And in presenting your argument --
21   let's see your Rasch and Rakuten USA?
22           MR. ROSENDORF:  Right.
23           THE COURT:  So when we get to Mr. Elegant,
24   Mr. Elegant, I'm going to want you to address the TOG
25   Brazil minimum contacts and fairness issue also in

1   whatever remarks that you have assigned to you.

2                 Okay.  So go ahead, Mr. Rosendorf.

3                 MR. ROSENDORF:  Thank you, your Honor.  And

4   I appreciate that, because there was -- particularly on

5   the legal issues there's substantial overlap between the

6   positions that we took on behalf of Rakuten USA and

7   Mr. Rasch and the positions that Mr. Elegant set forth in

8   his response on behalf of TOG.

9                 I'm going to be primarily addressing what I

10  will broadly called the Chapter 15 issues here with regard

11  to recognition and enforcement of the ex-parte Brazilian

12  order, whether under 1507, 1521, or otherwise.

13  Mr. Eisenberg is going to be addressing in more detail

14  some of the due process and minimum contacts issues, as

15  well as, if necessary, the issues with regard to the

16  Brazilian judiciary, which I will agree with you, your

17  Honor, that I think that there are a number of other basis

18  on which this can be resolved without ever reaching that

19  issue, which would be, I believe, really the only true

20  factual issue that would be substantively in dispute here,

21  and certainly, I assume, would be if we got to that point.

22  But I believe that there are a number of bridges that the

23  administrators are not able to cross before we even get to

24  that point.

25                 THE COURT:  Okay.  I'm going to stop you

Page 32

```
 1    before you get started.  When you get to the -- as you're
 2    going to address, I assume, the ex-parte proceedings, I'm
 3    going to ask you to specifically address, assuming that
 4    there were minimum contacts and in personam and in rem
 5    jurisdiction to enter an extraterritorial order, why the
 6    proceeding with the opportunity to weigh in afterwards is
 7    not appropriate or --
 8                    MR. ROSENDORF:  (Inaudible.)
 9                    THE COURT:  (Inaudible.)
10                    MR. ROSENDORF:  And I think that that due
11    process issue probably falls into Mr. Eisenberg's
12    bailiwick.
13                    THE COURT:  Okay.  That's fine.
14                    MR. ROSENDORF:  But we'll clear that up.
15                    THE COURT:  That's why I'm -- that's why I
16    said "assume."
17                    MR. ROSENDORF:  Yes.
18                    THE COURT:  Assume for purposes of your
19    argument that --
20                    MR. ROSENDORF:  That --
21                    THE COURT:  -- it was okay, you know,
22    because but in Petra Forte and in my Nevis opinion, and I
23    have a couple of other opinions where there were ex-parte
24    procedures with a post -- we will call it a post-op,
25    opportunity, where those -- I have addressed that in my
```

1    prior rulings.  So talk to me about this procedure.

2                    MR. ROSENDORF:  Okay.  And collectively we

3    will address that.

4                    THE COURT:  Okay.  That's fine.

5                    MR. ROSENDORF:  Your Honor, Chapter 15 was

6    established as a means of facilitating administration

7    across border insolvencies.  It was not created as a tool

8    for foreign administrators to run roughshod over

9    fundamental due process rights of U.S. citizens and U.S.

10   businesses.

11                   By the motion that's before you today, the

12   administrators are asking this Court to enforce or, I

13   suppose, we've now heard, enter its own an order that no

14   U.S. court could enter and which no U.S. bankruptcy

15   trustee could ever obtain, a pre-judgment attachment and

16   asset freeze to secure ultimate payment of a potential

17   judgment of liability for damages, all without any

18   showing, much less a finding, that the targets of that

19   pre-judgment attachment are transferring, hiding, and

20   secreting assets.

21                   And to compound the impropriety of that

22   request, the ex-parte order that the administrators ask

23   this Court to enforce was issued in violation of

24   fundamental principles of due process against parties who

25   had no minimum contacts with Brazil and without any

Page 34

1    meaningful procedure, and then what is, ultimately, still

2    a preliminary non-final order, which is not subject to

3    comity.

4              I'm not going to go through the background,

5    because I think it's set forth extensively in our papers,

6    but there are a couple of particular facts about the order

7    itself that I think that are highly relevant to this

8    discussion.  The administrators themselves acknowledge in

9    their filing that the relief requested in the veil

10   piercing action is to, quote, "Pierce the corporate veil

11   and hold the respondents liable for damages."  That comes

12   from their motion at paragraph 74, page 27, and they

13   repeat in that same paragraph that the nature of the

14   underlying action is to have, quote, "The effect of

15   holding a nondebtor liable for damages."  That's what this

16   action is.  It's an action for damages.

17             The second point is that by the

18   administrators own acknowledgement, the order is not

19   directed to assets of the debtor's or property of the

20   debtor's.  But rather, by the administrator's own

21   description of the order, the order is directed to the

22   assets of the targets themselves, and, indeed, the motion

23   acknowledges that the order, quote, "Does not deprive the

24   owner," meaning the targets, "from domain over the

25   assets."  That's at paragraph 38 of their motion on

1   page 15 and at paragraph 68, page 25.

2                  So we have an underlying action that is an

3   action for damages, and we have an order that attaches

4   assets of the defendants and is not based upon an

5   assertion that those assets are property of the debtor.

6   There are --

7                  THE COURT:  We lost you.  You went on mute.

8                  MR. ROSENDORF:  I'm sorry.

9                  THE COURT:  We have, "There are."

10                  MR. ROSENDORF:  I had moved (inaudible.)

11   Sorry, I won't do that again.  There we go.

12                  THE COURT:  We got to, "There are."

13                  MR. ROSENDORF:  There are three potential

14   avenues that I could identify for the potential

15   enforcement of this order.  The first was one that I

16   suspect the Court may have initially had the same

17   confusion that I did, which is the motion is styled as

18   Motion For an Order Recognizing the Brazilian Court Order.

19   You had a little bit of discussion of that with counsel,

20   and I'm not fully sure that I understand their response to

21   the Court's inquiry.

22                  I think we all agree that this is not a

23   recognition proceeding under Section 1517.  That already

24   occurred.  They filed a petition for recognition and a

25   motion for recognition.  The proceeding was recognized.

1  The foreign representatives -- or the foreign

2  administrators are representatives under that section.

3  But recognition under 1517 is not a proper or appropriate

4  vehicle for the enforcement of that particular order,

5  because the veil piercing action as described, again, by

6  the administrators themselves, is -- I believe the

7  terminology they use is an "adversary incident,"  it

8  appears to be the functional equivalent of a bankruptcy

9  adversary proceeding here, that proceeding is not a

10  foreign proceeding as that is defined in the Bankruptcy

11  Code.  The foreign proceeding is --

12             THE COURT:  I --

13             MR. ROSENDORF:  -- a collective judicial or

14  administrative proceeding.

15             THE COURT:  Okay.  I don't mean to interrupt

16  you, but I think Ms. Miller has already acknowledged

17  that --

18             MR. ROSENDORF:  Okay --

19             THE COURT:  -- (inaudible.)

20             MR. ROSENDORF:  -- and if that's the case,

21  that's fine.  But what concerned me when I heard that

22  acknowledgement was a follow-up comment, which I

23  understood her to be saying that because the proceeding

24  has been recognized, every order, including orders entered

25  in an adversary incident, are, likewise, entitled to

Page 37

1    recognition.  And I don't believe that to be the case at

2    all, and that would completely subsume the analysis

3    contemplated by Chapter 15 of providing either additional

4    assistance or appropriate relief.  Because if that's the

5    only question, that once the proceeding has been

6    recognized, that every order is entitled to enforcement,

7    that may not leave us an awful lot here to discuss, but

8    that can't possibly be the rational or the guiding

9    principle.

10                So if we agree that this is not a foreign

11   proceeding and that recognition of the underlying

12   proceeding does not govern or control the enforcement of

13   this particular order, then the two paths are either

14   additional assistance under section 1507 or appropriate

15   relief under 1521.  And we've cited both of those

16   provisions in our response here and refer to the

17   particular language in those, because the language in

18   multiple instances of both of those sections, when

19   referring to additional relief or assistance with regard

20   to property, refers to property of the debtor and debtor's

21   property.  As I noted when I was initially discussing the

22   content and description of the ex-parte order, the

23   ex-parte order does not relate to the administration or

24   disposition of property of the debtor.  It relates to the

25   targets' property and the freeze of that property by

1    virtue of that order.

2              So as a threshold matter, I would submit,

3    given the scope of both 1507 and 1521, we're not in right

4    neighborhood.  This is not about administering the

5    debtor's assets in the U.S.  This is about trying to

6    freeze a nondebtor's assets in support of a litigation

7    claim.

8              And then, of course, just setting out the

9    statutory framework here, any relief whether under 1507 or

10   1521 is limited by the provisions of 1506, which provide

11   that the Court may refuse to take an action that would be

12   manifestly contrary to the public policy of the United

13   States.  And as we will discuss broadly, the relief that

14   is sought here is not with respect to the property of the

15   debtor, is not additional relief that a bankruptcy trustee

16   would be entitled to under -- now I forget whether it was

17   1507 or 15 -- 1521, which limits the relief to which a

18   party, foreign representative, is entitled to relief that

19   may be available to a trustee, and is, in fact, manifestly

20   contrary to the public policy of the United States,

21   because it violates fundamental principles of due process.

22   And that takes us to Grupo Mexicano.

23              Again, by the administrator's own

24   description, the ex-parte order they seek to enforce is an

25   order which attaches the targets' assets, which are still

1    owned by the targets and is in furtherance of ultimate

2    recovery on an action for money damages.  Under Grupo

3    Mexicano, federal district courts are expressly prohibited

4    from entering such orders, and it would defy all logical

5    statutory construction to suggest that this Court or an

6    Article III court could not, as a matter of constitutional

7    due process, enter such an order on its own, but that it

8    may, notwithstanding the constitutional due process

9    infirmity of such an order, enforce it through Chapter 15.

10           And this is not just a matter of procedural

11   formalities, your Honor, in Grupo Mexicano itself, the

12   Supreme Court made clear this is a question that goes to,

13   quote, "The substantive rights of all property owners

14   based on historical principle and that the requirement of

15   obtaining a judgment before taking assets is a," quote,

16   'fundamental protection.'"  It is hard to imagine anything

17   that goes more to the roots of the basic property

18   interests protected by the U.S. Constitution than the

19   right to be free from having your assets frozen before a

20   judgment.

21           In addition to that, your Honor, the

22   Eleventh Circuit, following Grupo Mexicano, in cases like

23   Mitsubishi, which is 14 F.3d 1507, has made clear that you

24   need to look to the substance of the relief sought in the

25   underlying claim and not just the terminology.  And so

Page 40

1    notwithstanding the administrator's argument that they

2    brought this as a veil piercing action and, you know, that

3    under U.S. law would be consider an equitable claim, you

4    need to look at the ultimate relief that they are seeking,

5    which, again, they have made clear.  The end result of

6    this process is a money judgment holding the targets

7    liable for damages.  That is what they have said that they

8    are seeking here.  That clearly brings us within the

9    rubric of Grupo Mexicano.

10                Following Grupo Mexicano that means that the

11   relief that is available is available, if at all, under

12   Rule 64 of the Rules of Civil Procedure with regard to

13   pre-judgment attachment, which in turn refers to state law

14   provisions, which almost universally require not just

15   assertion of a claim in order to freeze assets, but

16   substantive evidence and findings that the defendant is

17   transferring, secreting, hiding assets.  Indisputably, not

18   a part of the record here, not a basis for the Court's

19   ruling.

20                Now, they've cited a number of cases to you,

21   your Honor, to try to make the argument that bankruptcy

22   trustees are entitled to similar relief here.  And we went

23   through each of those cases in our response.  What I think

24   you heard in response to the Court's inquiry today is that

25   cases do afford some relief under section 105 of the

Page 41

```
1    Bankruptcy Code and that that is an adequate statutory
2    basis for pre-judgment attachment.
3              I have gone back and looked at each of those
4    cases, again, while their presentation was being made.
5    There is, in fact, only one of them which even refers to
6    section 105.  That would be the -- I'm never going to be
7    able to pronounce this --
8              THE COURT:  Spell it.
9              MR. ROSENDORF:  -- Sledziejowski case, which
10   is 533 B.R. 408, which was specifically entering a
11   restraining order and preliminary injunction with regard
12   to assets of the debtor's estate.  None of the other cases
13   that they have cited rely on section 105 as a basis for
14   granting relief.  And as we already detailed in our
15   filing, a number of them specifically refer to state
16   pre-judgment remedy provisions, which is exactly the route
17   that you need to go if you're seeking a pre-judgment
18   attachment.
19             The Seidel versus Warner case was a
20   pre-judgment attachment under Texas state law.  The Wells
21   Fargo versus Wild (phonetic) case was under a New York
22   statutory restraining notice.  Two of the other cases were
23   actually post-judgment cases, not pre-judgment.  And the
24   one other case that doesn't fall in that rubric, the SK
25   Foods case was, again, based upon an assertion that the
```

Page 42

1   debtor itself had an interest in the property.  That is

2   not the scenario that's been presented to you here now,

3   and that is not an adequate basis for the Court's ruling

4   here.

5              What's being requested is an order that no

6   U.S. court could give because it violates basic and

7   fundamental notions of due process that are

8   constitutionally protected, and Chapter 15 is not a

9   backdoor for getting that which is constitutionally

10  prohibited.  Indeed, counsel acknowledged when we were

11  talking about comity that we are talking about ultimately

12  a U.S. Constitutional analysis, and if we undertake that

13  analysis, it is clear that these orders cannot satisfy

14  that.

15             The second and an independent basis why

16  these orders are not entitled to enforcement by this Court

17  is that they are nonfinal orders, and there is -- if you

18  look at going back to Hilton versus Guyot and how that

19  case has been interpreted by the Eleventh Circuit, there's

20  a focus on -- in connection with comity, on there being a

21  full and fair trial and a judgment as a basis for applying

22  comity, neither of which have occurred here.  And in

23  particular, I'm referring to the Daewoo Motor Americas

24  case, which is 459 F.3d 1249.  That's an Eleventh Circuit

25  case.

1              And, moreover, as we've cited in our papers,

2      there is not, under federal law anyway, an awful lot of

3      authority that would support extending comity to nonfinal

4      interlocutory orders.  In fact, we've cited to the Court

5      at least a couple of cases that note -- that cite within

6      them a number of other cases that as a general matter

7      comity is not extended to nonfinal non-merit orders and

8      preliminary injunctions in particular, especially when

9      they are entered on an ex-parte basis, and in particular

10     that's the Espirite Sante (phonetic) case out of New York,

11     all of which fits the description here.

12             Instead, administrator's counsel in this

13     instance decide to look to state law and cites a number of

14     Florida intermediate appellate decisions that appear to

15     give comity affect to interlocutory nonfinal foreign

16     orders.  But as discussed in the Nahar case, 656 So.2d

17     225, the concurrence in that case describes exactly the

18     same issue that I identified when I was reading those

19     cases, which is it misreads the restatement provisions --

20     for those cases misreads the restatement provisions that

21     they rely upon.  Because if you're following the second

22     restatement in conflict of laws, as some of these Florida

23     courts purport to do, you also have to read section 107 of

24     that, which says that comity is not extended generally to

25     a judgment that is not a final determination.  And the

1    Florida courts have done so -- have just not even

2    mentioned or referred to that or to an earlier Florida

3    Supreme Court case that ruled in the same manner.

4              I know this Court in the Nevis case spoke to

5    the issue of enforcement of a nonfinal order.  I would

6    submit that that was a very different and distinguishable

7    context in connection with -- in that case I believe it

8    was a post-judgment for you and an asset for which a

9    foreign representative or administrator had been appointed

10   under an Italian Anti-Mafia Code, and the recognition of

11   that administrator was really something largely equivalent

12   to the recognition of a foreign representative, you know

13   in a foreign proceeding here.  That in and of itself is

14   not an asset freeze in satisfaction of a potential

15   judgment.  That was, to my understanding, just an issue of

16   who controlled that particular asset and whether that

17   administrator's authority would be recognized.

18             So, your Honor, Mr. Eisenberg can further

19   address the issues with regard to minimum contacts and due

20   process.  There's one other issue which has not been

21   touched upon, but which I would like to address with

22   regard to Chapter 15 requirements.

23             If this Court is going to entertain any

24   relief whatsoever with regard to this request, I believe

25   that it must, in doing so, consider as well the imposition

Page 45

1    of a bond requirement to do so.  The only argument

2    advanced by the administrators against that relied on two

3    unpublished and, by all appearances, uncontested orders

4    which, you know, effectively waived the requirement

5    treating a foreign administrator like a bankruptcy

6    trustee.  They were operating under Rule 65, which as

7    we've indicated is the wrong rule.  And, frankly, there's

8    just -- there's no reason to immunize a foreign

9    administrator from the dramatic damage that would be

10   caused by an asset freeze order like this, particularly

11   when within Chapter 15 itself, section 1522, the Code says

12   that you can condition granting any relief under 1521 or

13   1519 by requiring the filing of a bond.

14            Now, I don't believe that we should get

15   anywhere close to there.  I don't believe that this is an

16   order that can or should be enforced under basic

17   principles of comity and under basic principles of due

18   process here.  But if the Court is entertaining that at

19   all, we would submit that there needs to be a requirement

20   of a bond in order to impose any injunctive relief against

21   these targets.

22            THE COURT:  Okay.  Thank you, Mr. Rosendorf.

23            MR. ROSENDORF:  Thank you, your Honor.

24            THE COURT:  Mr. Eisenberg, before you start,

25   I just want to tell those of you who are here for the 2:30

Page 46

1    calendar, I'm running a little late.  But this is a very

2    interesting argument regarding Chapter 15, so I hope that

3    you'll take advantage of the free CLE that you're being

4    given by listening to these excellent attorneys.

5                    Now, Mr. Eisenberg, in making your remarks

6    I'm going to ask you to skip any arguments regarding

7    whether there's corruption in the Brazilian insolvency

8    court.  As I said before, that's an issue that I only want

9    to address if and as I absolutely must.  And since that is

10   only one of several arguments, I would like you to forego

11   that, and if I do not -- if I rule that I would,

12   otherwise, grant comity to this order, then we can circle

13   back and have an argument and discuss the outlines of any

14   evidentiary hearing on that issue.  You can address my

15   request in your remarks.

16                    MR. EISENBERG:  Thank you, your Honor.  And,

17   frankly, I appreciate the Court's statement on that,

18   because I think as a practical matter that's the

19   appropriate way to approach this, because that's an issue

20   that might require quite a bit of factual undertaking, and

21   most of the other issues that have to be addressed here

22   are straightforward legal issues, including the lack of

23   minimum contacts that our clients have with the Brazilian

24   forum.

25                    I know that the Court posed a hypothetical

1  that the Court wanted me to address in connection with

2  dealing with public policy arguments, but I want to note

3  that in addressing that, it is useful to note that we did

4  our homework when we filed our papers.  We filed

5  declarations from people knowledgeable at Rakuten USA and

6  from Mr. Rasch himself dealing very specifically with the

7  lack of minimum contacts both Rakuten and Mr. Rasch have

8  with Brazil, and those are uncontested and unrebutted.

9  And on those basis, we believe that it's not even a

10  contest that there's a lack of minimum contacts that both

11  of them have.  So I will address the Court's question

12  about assume that they were there for purposes of how we

13  address that, but I think it's important to note at the

14  outset, we did what you're supposed to do when you're

15  attempting to demonstrate a lack of minimum contacts.  We

16  provided the supporting affidavits from people with the

17  knowledge to be able to make the statements as to the lack

18  of minimum contacts, and we have not seen any contest to

19  any of those specific facts, the lack the participation

20  and activity in Brazil.

21        The only contact of Rakuten USA is the

22  remote minuscule fraction of shares in remote entities.

23  Mr. Rasch, I think has fewer contacts, so that's not

24  really at issue, but I'll come back to that in a moment.

25  I think, your Honor --

1          THE COURT:  Well, let me -- wait, wait,

2     wait.  Let me stop you for minute.  That was for

3     Mr. Rosendorf.  You can argue lack of minimum contacts.

4     That was just for Mr. Rosendorf, okay, because I knew you

5     were going to argue lack of minimum contacts.

6          MR. EISENBERG:  Okay.  Well, I'm going to

7     make my argument as to lack of minimum contacts very

8     straightforwardly.  You have to have both minimum contacts

9     and purposes availment of a forum.  Rakuten USA structured

10    its activities carefully so that it did not have minimum

11    contacts with Brazil.  It laid it out -- we laid it out in

12    detail in the supporting declaration from Mr. Sue

13    (phonetic).  Those facts, in terms of a lack of

14    involvement and relationship with Rakuten USA to Brazil,

15    are uncontested and uncontestable.  It didn't maintain

16    bank accounts there.  It didn't do business there.  It

17    didn't hold itself out as a party doing business there.

18    The only connection is the minuscule percentage of

19    ownership interest in the entity that subsequently got

20    sold.  That in and of itself cannot suffice to create

21    minimum contacts, and those are the only contacts that can

22    be demonstrated between Rakuten USA and Brazil.

23          Similarly, with Mr. Rasch, he has the same

24    lack of contacts, plus he didn't own any shares of any

25    entity that did business in Brazil.  So he's even further

Page 49

1    removed.  Now, his only contact, essentially, is being a

2    notice party, and the notices had to be sent to the United

3    States.  So he's, obviously, not, you know, sitting in

4    Brazil receiving the notices.  He's not doing any

5    purposeful availment of any of the facilities in Brazil.

6    So I think it's compelling that based on the -- based on

7    the papers that we have submitted, the declarations with

8    specificity, neither Rakuten USA, nor Mr. Rasch had any

9    minimum contacts with Brazil.  And for that reason alone,

10   the Brazilian order cannot be enforced as an ex-parte, no

11   bond, pre-judgment basis against either of them.

12              It could not be done if the Brazilian

13   judicial administrator had come here initially and said to

14   that judge, whichever forum that they would have gone to

15   in the United States, "I want an ex-parte seizure of

16   assets of either Mr. Rasch or Rakuten USA, and I don't

17   want to have to post a bond, and I want to do it simply

18   because I'm asserting my pre-judgment claim," that would

19   have been summarily rejected, the request of that order

20   would be summarily rejected.  You don't get to get around

21   that by having minimum contacts lacking overseas, and then

22   have a foreign tribunal reach out and do that.

23              If Mr. Rasch or Rakuten USA are not

24   susceptible to having their assets seized on a

25   pre-judgment, ex-parte, no bond basis here in the United

1   States by way of a proceeding where they couldn't get

2   access to the docket and filings before the ex-parte order

3   was entered, all the more so a foreign tribunal, where

4   they have no minimum contacts, can't enter a similar

5   order, and expect that this nation's court system, in

6   derogation of the most fundamental principles of due

7   process, would abrogate their right to freeze or seizure

8   of property without due process of law.  It can't be done.

9   There is no support in the case law for the proposition

10  that if a foreign tribunal simply ignores the requirement

11  for minimum contacts that this nation should give comity

12  to that.  The right to be free of being hailed in front of

13  a tribunal, with which you have no minimum contacts, is at

14  the heart of what due process of law is.

15              There are two elements of due process of law

16  that are fundamental under our Constitution that are at

17  issue here.  One is the right to not have property seized

18  without due process of law, and the due process of law

19  that's clear in the United States jurisprudence is you

20  can't have pre-judgment asset seizures, at least without

21  having to follow the detailed procedures set forth in

22  Rule 64 or analogous state procedures, which means

23  demonstrating they're about to abscond and posting a bond.

24  There's no assertion that either Rakuten USA or Mr. Rasch

25  is about to abscond from the United States with any of

1    their assets, and there's no effort to post a bond.  You

2    would never get a seizure order if you were seeking one on

3    your own here.  That kind of protection from being

4    susceptible to that oversees carries a price.  It doesn't

5    change because it's a foreign tribunal seeking to do it.

6    That's number one.

7              Number two, the procedures that were used

8    were not appropriate or fair to either Mr. Rasch or

9    Rakuten USA.  Rakuten USA and Mr. Rasch found out about

10   this seizure after the fact.  They could not get access to

11   the docket, initially, to even contest it, and now they

12   are in a situation where they're being told, "Oh, you're

13   susceptible to this overseas order that was entered

14   against you without notice to you, without access to the

15   docket, purporting to seize your assets pre-judgment, on a

16   simple straightforward monetary damages claim, without the

17   requirement to post bond."  I mean, I'm getting exhausted

18   listening to the various principles of constitutional law

19   that are being run roughshod over here.

20             The fundamental principles of due process

21   are set up to protect, and the fact that this order is

22   interlocutory is not changed by the fact that there was an

23   appeal, interlocutory appeal, because that doesn't change

24   the status of the underlying order.  The denial of the

25   interlocutory appeal just simply leaves in place an

1   interlocutory order that was ex-parte, that was nonfinal,

2   that was a pre-judgment asset seizure without the

3   requirement to post a bond.  Interlocutory appeals are not

4   the same thing as full-fledged hearings on the merits,

5   where a party has posted evidence.  Appellate procedures

6   are much more truncated than the trial procedures, where

7   one has the opportunity to contest at the outset, and so

8   on that basis I think it's pretty clear that there are at

9   least five or six major principles of constitutional due

10  process that go to fundamental protection of property

11  rights that are purported to be run roughshod over as to

12  both to Rakuten USA and Mr. Rasch, both of whom have

13  provided very specific detailed declarations that show

14  that they don't have minimum contacts with Brazil.

15              If I can pause to take a breath, I'll ask

16  the Court if it has any further questions, but I think you

17  know this is rather compelling, and just to reinforce one

18  of the points that Mr. Rosendorf made, the lack of a bond

19  is key.  If you want to seize someone else's property,

20  generally you have to protect that party against damages

21  from the seizure of that party's property.  That's why a

22  bond requirement is so fundamental.  We shouldn't have to

23  get to the bond requirement.  But the fact that it was

24  just simply ignored below or in the courts in Brazil that

25  is simply reinforcement for how out-of-bounds this order

Page 53

1    is in terms of not being subject to being granted comity.

2                    The Grupo Mexicano case is very clear.  It's

3    Supreme Court precedent.  It's directly on point.  To the

4    extent that there may have been decisions in state courts

5    that seem to grant ex-parte asset seizure pre-judgment, it

6    would seem to me that those are in derogation of the

7    Supreme Court case in Grupo Mexicano.  And I think that

8    the bottom line is we have a very clear compelling case

9    that five or six major principles of constitutional

10   jurisprudence are being run roughshod over if this Court

11   granted comity under these circumstances.

12                   If the judicial administrator wants to come

13   here and file an adversary proceeding asserting the

14   Rakuten USA and Mr. Rasch should be held liable for events

15   that took place in Brazil and seek to prove it, they can

16   file an adversary proceeding.  They can issue summons, and

17   if they want to try to gain a pre-judgment attachment,

18   they can try to meet the standards under Rule 64, which is

19   made applicable in an adversary under Rule 7064, and if so

20   they are going to have to post a bond and meet the

21   cumbersome standards.

22                   The idea that one gets around that because

23   one is a foreign representative rather than a United

24   States Chapter 11 trustee is repugnant to our

25   jurisprudence.  Chapter 15 is a crutch.  It's not a claw.

Page 54

1          THE COURT:  All right.  Thank you

2   Mr. Eisenberg.  I have no questions.

3          MR. ROSENDORF:  Your Honor if I may, very

4   briefly, I just want to, I think, address the situation

5   you posited to me and sort of synthesize our

6   presentations.  I think that each of the arguments and

7   issues that have been raised here, like --

8          THE COURT:  Okay.  Stop.  I'm sorry, stop

9   talking.  I was just told by Ms. Sanabria that we're

10  having audio problems, and since this is a recorded

11  proceeding, don't talk.

12          While you're not talking, I'll tell those

13  who have just joined that are here for the three o'clock,

14  I'm still working on the 1:30.  We have a fascinating

15  Chapter 15 argument that involves issues relating to

16  comity and constitutional law.  There will be no extra

17  charge for the CLE that you will be receiving while you

18  wait your turn.  So I hope that you listen and take notes.

19  This is an opportunity that you all don't normally get, to

20  hear such good arguments by such excellent lawyers.

21          All right.  So, Mr. Rosendorf, I'm now told

22  that we have audio again.  So you wanted to coalesce and

23  circle back to one of the arguments before we give

24  Mr. Elegant his turn, and then, of course, Ms. Miller gets

25  the final say.

```
1              All right.  Go ahead.
2              MR. ROSENDORF:  Thank you, your Honor, and
3    I'll be very brief.
4              The only point I wanted to make is that I
5    think the presentations that we have made establish
6    independent and sufficient, each, grounds for denying
7    enforcement of this order.  Even if there were minimum
8    contacts, the order that they seek to enforce is
9    unenforceable because it violates basic principles of due
10   process and protection of property under U.S. law --
11             THE COURT:  Okay.
12             MR. ROSENDORF:  -- even if the order were
13   enforceable, it would not be enforceable against Rakuten
14   USA and Mr. Rasch here, because they do not have minimum
15   contacts with Brazil, and the Court did not and could not
16   properly enter such jurisdiction.
17             THE COURT:  Okay.  All right.  So even if
18   there were minimum contacts, it doesn't matter because the
19   order itself violates principles of due process and
20   constitutional law, so I cannot give it comity.  Okay.
21             All right.  Thank you, Mr. Rosendorf.
22             All right.  Mr. Elliot, you have the last
23   word on the objector's side before I hear back from
24   Ms. Miller.
25             MR. ELEGANT:  Okay.  Thank you, your Honor.
```

1              First, you know, we'll adopt the arguments
2      that have been raised by Mr. Rosendorf with regard to
3      Chapter 15, et cetera.
4              I want to look just a little deeper at some
5      of the application here and what this ask is of the Court,
6      which, you know, we find to be pretty outrageous, a
7      pre-judgment attachment based upon a pending action in
8      another country.  Here there's no specific allegations
9      with regard to, you know, what my client did in the
10      underlying matter.  There's no specific findings, of
11      course, in the order.  My client is mentioned once in the
12      underlying complaint.  The complaint itself was not
13      attached as an exhibit.  I believe it's about 96 pages,
14      wasn't translated, maybe that was for cost or whatever,
15      but, you know, we've had that reviewed and, you know, come
16      to that conclusion.  So without allegations of wrongdoing,
17      you don't have any allegations of what you, as a
18      defendant, did versus any other defendant.
19              And here to ask this Court now to
20      essentially hold each respondent liable, joint and
21      several, for about a $29 million amount and freeze assets
22      is just unsupportable, and the bottom line of our
23      response, as well as we agree with the Rakuten response,
24      that there was -- when we looked -- we all looked hard for
25      a case where this has been done, and it hasn't been done.

1   And, if anything, sure, the briefing schedule was tough

2   with a couple days or a day to turnaround, the way it

3   worked.  But if there was authority that Ms. Miller had

4   that showed another court doing what they're asking for

5   here, she certainly would have advanced it.

6           There's absolutely no urgency here when you

7   look a little deeper, look at the ask for the pre-judgment

8   attachment under Florida law, there's no urgency here.  I

9   mean, they've waited about 567 days from the day that the

10  injunction was entered to the filing of the motion to have

11  this injunction recognized.

12          The purpose doesn't line up with Chapter 15.

13  The purpose here is to seize nondebtor assets.  One of

14  the -- you know, Rakuten has an extensive minimum contacts

15  and due process challenge and analysis in their papers.

16  One of the points in our papers for the Court just to be

17  aware of, from May 23rd, 2022, which was the filing of a

18  Chapter 15 matter, to October 25th, 2023, which was about

19  18 months, my clients weren't served with anything in the

20  Chapter 15 case.  When counsel contacted counsel for the

21  foreign representative is when dialogue started.

22          You know, the standard with regard to

23  comity, I don't want to repeat a bunch of arguments, but

24  with regard to what is decent and just, here without a

25  merits determination, without a judgment, in a matter

Page 58

1    that's essentially not part of the main proceeding

2    pursuant to Chapter 15, it's a separate veil piercing

3    lawsuit for money damages, there's just no support for the

4    relief that they are seeking.

5              And several of the opinions cited by the

6    opposition, they're distinguishable because they referred

7    to assets of the debtors' estates specifically, assets

8    where they had a particular equitable interest or

9    ownership, et cetera.  So it wasn't just to the personal

10   assets of a nondebtor that they were seeking to seize.

11             And one of the other things, practically, if

12   someone comes before your Honor and says, "I would like to

13   have an injunction enforced," well, what's the trial

14   schedule for the underlying court?  Is this Court supposed

15   to enter injunctive relief indefinitely?  No one even

16   knows.  There's no trial.  There's no understanding of how

17   long, if this Court were to find that it should be

18   enforced, which of course we disagree with, so

19   practically -- that's another way that the Court should

20   consider it.

21             You know, the bond requirement has been

22   discussed at length, and the standard for pre-judgment

23   attachment is just very, very difficult in Florida.  Very

24   often I do judgment enforcement cases where people are

25   expecting to get a very, very large judgment, and they're

1   assessing whether they're going to be able to collect.

2   And right away someone says, "Well, yeah, I want to put a

3   net on somebody's assets, I want pre-judgment

4   attachments," and when you look at the urgency requirement

5   and what's, you know, statutorily mandated in the four-

6   point test, it's just very, very difficult to overcome.

7   And here, without a case showing this has been done in

8   this context by a similar court, without the urgency,

9   without the underlying judgment, in an action that's

10  pending and there could be changes in the findings or

11  litigation could take a different course, a lot of these

12  could happen, we see no basis for the Court to grant the

13  relief sought.

14              THE COURT:  Okay.  Thank you, Mr. Elegant.

15              All right.  Ms. Miller, I'm going to give

16  you an opportunity to respond.  You don't need to repeat

17  anything that you've already argued.  I do want you to --

18  and I did mean to ask you initially, and maybe I did, but

19  not in an appropriate -- I don't want to say

20  "appropriate" -- in a way that would have elicited the

21  kind of information that I wanted.  But you did mention

22  TOG Brazil and that -- but I do recall in the TOG/Hahn

23  papers that Mr. Elegant had argued that Mr. Hahn wasn't

24  even mentioned in the original pleadings that were filed.

25  I'm assuming that's the complaint, the veil piercing

1    complaint that was filed, and that the only mention of

2    Mr. Hahn in the very short order that was entered by the

3    bankruptcy -- the insolvency judge just handles him by

4    name, with no articulation as to why or how Mr. Hahn would

5    be -- why he was being named in the lawsuit.

6             And then with respect to Rakuten USA and

7    Mr. Rasch, again, obviously recognizing that these

8    documents were only filed a week ago, but whether you have

9    any response to the argument of Rakuten USA and Mr. Rasch

10   that their only connections are in the former -- .001

11   percent shares that were owned, and with respect to

12   Mr. Rasch that he's the notice party, and what

13   allegations, if any, in the underlying complaint from the

14   injunction order emanated -- with respect to all four of

15   those defendants, what, if anything, was articulated that

16   would outline the liability.  But that's in addition to

17   whatever other responding remarks you want to make.

18             As I said I've taken -- as you know me, I've

19   taken copious notes, my law clerk has, so you don't need

20   to repeat any arguments you've made, but, obviously, you

21   can respond to whatever you wish.

22             And, again, for those of you who are just

23   joining for the three o'clock, I'm still on the 1:30, free

24   CLE on Chapter 15 and con law.

25             Okay.  Ms. Miller, please.

1          MS. MILLER:  Thank you, your Honor.

2              I will take a moment to address the urgency

3    and the reason for the delay after the order was entered

4    in Brazil.  You know, we are quite aware of the courts

5    here in the United States need for a showing of due

6    process in order to recognize a foreign order.  And we're

7    also aware that an ex-parte preliminary injunction is

8    not -- is not seen in a favorable light.  So that's why

9    the foreign representative thought it was prudent to wait

10   until the parties have had an opportunity to appeal and

11   the appeals have been heard, and so we are not just

12   bringing before your Honor the trial court decision, but

13   we're also bringing this up at a time when the parties

14   have had the opportunity and most of them have taken it,

15   but some of them have not, to appeal and to have those

16   claims heard at the appellate level.

17             I will say, you know, no, they don't hold

18   evidentiary hearings the way that we do in Brazil, but

19   parties are permitted to present evidence on appeal, and I

20   believe that comes out in the affidavits.  Of course, the

21   affidavits, being written by Americans, focus on

22   testimonial evidence, but it's really just not a

23   testimonial system like we are here in the United States.

24   They don't have jury trials for civil matters in Brazil,

25   and they just don't rely on oral evidence the way that we

1    do.

2              So the fact that the procedural rules called

3    for written evidence doesn't preclude anyone from

4    submitting declarations and affidavits and getting all the

5    facts before the appellate court that they thought were

6    appropriate, and certainly the same procedural posture has

7    been upheld in other cases, such as in the Petra Forte

8    case where, as your Honor mentioned, Judge Mark found that

9    such -- that appellate review sufficed for due process

10   purposes.

11             THE COURT:  Right.  But I addressed that in,

12   the Petra Forte as well, in my case, which was Tatiana

13   Quineros (phonetic), I think was the name, in those cases

14   those were situations in which, under Brazil, and

15   Colombian in my case, bankruptcy -- or insolvency

16   proceedings, rather, I'm sorry, I know they are not

17   necessarily the same word -- additional debtors were

18   created by virtue of these fraudulent conveyance targets,

19   and there there was a different procedure based on a

20   different type of relief that was being sought.  Similarly

21   in the Nevis case, the whole issue in that case was

22   whether to give comity to a procedure which appointed an

23   administrator over the assets of someone who was alleged

24   to have been a Mafioso or some other type of crime lord,

25   whether to recognize -- not -- well, I know, we're all

1    getting -- we all have to stay away from that word when

2    we're dealing with Chapter 15 -- to give comity to,

3    essentially, a settlement that was entered into between

4    that administrator that was given control of the assets of

5    the alleged crime lord and looking at the Italian process.

6                    And so I recognize your argument, but not

7    all ex-parte proceedings are the same, and so when you do

8    your written submission, which I'm going to allow you the

9    opportunity to do, so both sides, or all three sides,

10   however many sides you are, I do want to know whether you

11   have any case where a court, anywhere outside of Brazil,

12   has given comity or whatever would be the equivalent in

13   that jurisdiction to this type of an ex-parte order.

14   Because Petra Forte and in my case, it was a different

15   kind of ex-parte order.  The same with Nevis, so if you

16   can keep that in mind, but please continue with your

17   argument.  Obviously, I have some concerns.  I mean,

18   I'm -- but go ahead, continue with your argument.

19                    MS. MILLER:  Thank you, your Honor.

20                    With respect to the minimum contacts

21   analysis, I think a few more facts are important to take

22   into account.  In the sale transaction that the Brazilian

23   court analyzed, the sale of the shares of the four debtor

24   companies, it is significant that Rakuten USA signed the

25   three side letters that were attached to their objections.

1   So those side letters were instrumental.  They -- you

2   know, Rakuten themselves claims that they were part and

3   parcel of the deal with TOG Brazil, and those side letters

4   provided for the payment of over $5 million to TOG Brazil

5   as consideration for its turnaround efforts and that that

6   payment would be made not by Rakuten Group or by Rakuten

7   Brazil, but that the payment would be made by Rakuten USA

8   itself.  And I believe the declaration also states that

9   the payment was indeed made, as contemplated in the

10   letters, by Rakuten USA.

11          So those were acts, you know, directed

12   towards the Brazilian business.  I'm sure they will claim

13   that the person who actually signed never went to Brazil

14   and signed from the United States, but they were certainly

15   done in order to consummate the transaction in Brazil and

16   for the shares of the Brazilian companies.

17          Also with respect to Mike Hahn, you know, I

18   think there's a difference between -- certainly between

19   the way American courts write, and the clarity and

20   particularity, and the way that the Brazilian order is

21   written.  I mean, you probably would never see an

22   injunction order that's only three-and-a-half pages long

23   out of an American court, but the evidence itself, which

24   was attached, you know, it was several hundred pages of

25   evidence which was attached to the initial pleading,

1    certainly includes Mike Hahn's name.  He comes in the

2    attachments to a Rakuten's objections and, you know, as

3    the signor and the person who spoke for TOG Brazil.

4              So to the extent that TOG Brazil was

5    incorporated to conduct business in the United States --

6    or, sorry, to conduct business in Brazil, was, in fact,

7    conducting business in Brazil through the other three

8    debtor companies, you know, and was directing the

9    activities of those companies -- I mean, it was TOG Brazil

10   acting through Mike Hahn that set out the business plan,

11   right, the business plan to fire all the employees and do

12   certain things.  Those plans were all approved by Mike

13   Hahn.

14             So what did the foreign administrator have

15   at the time and the evidence that was attached to the

16   complaint, you know, if the Court is interested in seeing

17   that, we will get that translated, but we will see that

18   wherever TOG is being represented, it's being represented

19   in these transactions by Mike Hahn.

20             THE COURT:  Okay.  What else?

21             MS. MILLER:  And so those are the points I

22   have to make with respect to the facts.

23             I don't know if the Court is interested in

24   having those things translated prior submissions, that way

25   the other sides can also incorporate them in any

Page 66

1    submission that they are interested in making.

2             THE COURT:  Well, let me address

3    specifically that point, because it goes to the question I

4    asked you, and I apologize if I did not ask it thoroughly.

5             Correct me if I'm wrong, the injunction

6    order, my understanding, was issued in connection with the

7    veil piercing adversary; is that correct?

8             MS. MILLER:  That's correct.

9             THE COURT:  So my question for you is, what

10   allegations in the adversary -- I don't care what the

11   attachment says.  You might find my name somewhere in all

12   of the attachments.  I mean, that does not a claim make,

13   even under Brazil law.  Okay?

14            So what I want to know is, what claims

15   against these four parties are alleged in the complaint

16   such that it would be appropriate to have an injunction

17   issued?  Because, remember, you've acknowledged,

18   Ms. Miller, that you are not arguing general jurisdiction

19   for purposes of the constitutionality of the contacts for

20   jurisdiction over these parties.  You're arguing specific

21   jurisdiction.  And if it's specific jurisdiction, it has

22   to be specific to the allegations of the complaint giving

23   rise to the injunction.

24            If there are no allegations in the complaint

25   for which it would be appropriate to issue the injunction

1   order against these four objectors, then we're done.

2   Okay.  We're done.  Because then you cannot establish --

3   putting aside all the other problems that you, at least

4   superficially have, we'll say at least superficially, I'm

5   going to be honest with you, they're more than

6   superficial, but I'm going to give a chance to argue -- I

7   mean, put it in your submission.  But if there are no

8   allegations in the complaint, then there is nothing upon

9   which you can base specific jurisdiction with respect to

10  the injunction order.  That's why I asked the question.

11           So if you already know that before you get

12  started, you don't need to go through the expense of

13  translating the complaint, because it doesn't matter

14  what's in the attachments.  Like I said, anybody's names

15  could be in the attachments.  I mean, even you said it's

16  hundreds of pages.  Okay?  So that's what I meant by that.

17           Okay.  So here's where we are, you have a

18  lot of problems collectively, the foreign administrator

19  group, with respect to this issue.  One is the Grupo

20  Mexicano issue, and it is a serious one.  I appreciate the

21  dicta, always appreciate getting a nod from the Supreme

22  Court, never appreciate when Supreme Court mentions

23  (distorted audio) bankruptcy because they never do the

24  right thing.  We all know that as bankruptcy

25  practitioners.  But I'm having a hard time understanding

1    how relief that the United States Supreme Court has held

2    as unconstitutional could somehow become constitutional by

3    virtue of the arguments that you've made.  But if you

4    believe that you can articulate in a competing order --

5    because that's what you're going to give me, you're going

6    to give me competing orders -- then I'm giving you that

7    opportunity to present that.

8                    With respect to the interlocutory order, I

9    mean even the order itself that was entered by the

10   insolvency court, it makes very clear that it's not making

11   any findings regarding liability, and it harkens to me the

12   issue that I addressed in another one of my Laspro

13   decisions, I call it the case that keeps on giving, it was

14   proposed findings of fact and conclusions of law on cross-

15   motions for summary judgment.  And, Ms. Miller, I know

16   your firm is intimately involved in that case, so you

17   might be able to easily find the decision.  In that case I

18   was looking at not comity, per se, but whether I should

19   give collateral estoppel recognition -- here we go again

20   collateral estoppel credit to a BACEN, B-A-C-E-N, report.

21   And in that case, although I did give comity to the report

22   for a variety of reasons set forth in that opinion, I did

23   not give it any collateral estoppel value, because it was

24   an interlocutory finding by the court solely for the

25   purpose of allowing the insolvency of the bank or the --

Page 69

```
 1   yeah, the bank to go forward.  It wasn't a final
 2   adjudication of the preliminary findings that were made.
 3                   And, of course, in this case -- for those of
 4   you who are not at the 1:30 hearing, please keep your
 5   cameras off -- it was not a final proceeding, and so I
 6   will give you, again, that opportunity in your competing
 7   order to explain why this interlocutory order should be
 8   given comity, notwithstanding the procedural infirmities.
 9   I've already discussed the constitutional issue with you
10   relating to the pleading from which the injunction arises,
11   and that may be a nonstarter in and of itself.
12                   But also regarding the arguments that were
13   made by Mr. Eisenberg, and that is Mr. Eisenberg argued
14   that even if there were minimum contacts that the
15   complete -- that the procedure, while it might be
16   acceptable in Brazil, and I'm not being critical -- look,
17   I think the fact that Brazil doesn't have jury trials,
18   except for I think it was death cases, right, not even
19   criminal cases, only death cases, I think the general
20   public here would be thrilled with that.  But in any
21   event, the bottom line is that no bond, no opportunity, no
22   basis to layout the grounds upon which it would be
23   appropriate to seize these pre-judgment assets, nothing.
24   And why, even if that procedure that is acceptable under
25   Brazil's constitutional structure, since it seems to be
```

Page 70

1   so -- it appears on its face to be so contrary to our

2   notions of due process, why that wouldn't be the case.

3               And so that's where your weak spots really

4   are, and I'm being honest with you here.  And part of me

5   would say, well, there's no point, but you have persuaded

6   me enough to give you the opportunity to try to lay it

7   out.  As I said if after you review the complaint, there

8   are no allegations that would support any type of relief

9   against these four objecting parties, then I would suggest

10  that you just submit an order denying the motion.  But

11  I'll give you that opportunity.

12              I'm going to be leaving the country and not

13  returning until April 15th or -- well, 13th, but to court

14  on the 15th, so I'm going to give you all at least until

15  that date to submit your competing orders and any

16  additional time after that that you all agree.  I will

17  leave it up to you all to determine what your timeframe

18  is.

19              They need to be -- I'm going to ask you to

20  submit them simultaneously.  You've heard each other's

21  arguments.  So I don't see any reason for you, then me,

22  then you.  For the collectively objecting side, to the

23  extent that you can coordinate, similar to how you did

24  your arguments today, one submission, that would be fine.

25  If it's more trouble than it's worth to divide the work

Page 71

1    out, as opposed to each of you submitting your own, you

2    can do that as well.  But since you did such a good job

3    with your oral arguments, I'm gonna rely on you.

4              As I said before I do not want to hear about

5    the courts in Brazil being corrupt.  If and at such time

6    as we have to address that issue, we'll address it

7    separately.

8              Okay.  So, Ms. Miller, any questions?

9              MS. MILLER:  No, your Honor.  Thank you.

10             THE COURT:  Mr. Rosendorf, any questions?

11             MR. ROSENDORF:  No.  Thank you, your Honor.

12             THE COURT:  Mr. Eisenberg?

13             MR. EISENBERG:  No.  Thank you very much,

14   your Honor.

15             THE COURT:  Mr. Elegant, any questions?

16             MR. ELEGANT:  No.  Thank you, Judge.

17             THE COURT:  All right.  Well, I want to

18   thank all of you for attending today.  I appreciate it.

19   As I said I would have preferred to have seen you all in

20   person.  I apologize again for the scheduling mishap on

21   our side caused you to have to appear by video.  But,

22   again, I can see in most of your faces that you are

23   thrilled beyond your ability to express yourselves that

24   you did not have to come.  Even Mr. Rosendorf and

25   Ms. Miller who did not have to come so far.

1            MR. ROSENDORF:  I was looking forward to

2  going to court, but that's okay.

3            THE COURT:  Well, only because our elegant

4  and beautiful new lobby is now open, and at some point I

5  hope you all have a chance to see it.

6            So stay safe and stay well.  The Court is

7  going to take a five-minute recess, and then I will start

8  my 2:30 calendar.  Thank you all again very much.

9            MR. ROSENDORF:  Thank you, Judge.

10            MR. EISENBERG:  Thank you very much, Judge.

11            MR. ELEGANT:  Thank you, Judge.

12            (Whereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1
2
3                          CERTIFICATION
4
5    STATE OF FLORIDA        :
6    COUNTY OF BREVARD       :
7
8              I, Anna M. Meagher, Shorthand Reporter and
9    Notary Public in and for the State of Florida at Large, do
10   hereby certify that the foregoing proceedings were
11   transcribed by me from a digital recording held on the
12   date and from the place as stated in the caption hereto on
13   Page 1 to the best of my ability.
14             WITNESS my hand this 8th day of April, 2024.
15
16   _____
17             ANNA M. MEAGHER, Shorthand Reporter
               and Notary Public in and for the
18             State of Florida at Large
               Commission #HH59960
19             January 9, 2025
20
21
22
23
24
25